Richard P. Rinaldo, Esq.
**THE RINALDO LAW FIRM**
60 Morris Tpk., Suite 3B
Summit, NJ 07901
Tel: 973-346-8700
Fax: 973-467-1178

Kim E. Richman, Esq.,
Maurice L. Hudson, Esq.,
**REESE RICHMAN LLP**
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Tel: 212-643-0500
Fax: 212-253-4272

*Attorneys for Plaintiff Elvis Soto-Muniz*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ELVIS SOTO-MUNIZ, <br><br> Plaintiff, <br><br> v. <br><br> CORIZON, INC. F/K/A CORRECTIONAL MEDICAL SERVICES, INC., DAVID MEEKER, DR. ALLAN MARTIN, DR. LIONEL ANICETTE, DR. YASSER SOLIMAN, and "JOHN DOES" #1-5 (said names being fictitious, as the true names are presently unknown), Individually and in their Official Capacities, <br><br> Defendants. | Civil Action No. 1:10-cv-03617 (RBK)(KMW) <br><br><br> <u>Civil Action</u> <br><br><br> **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Elvis Soto-Muniz ("Plaintiff" or "Mr. Soto-Muniz"), by his attorneys, REESE RICHMAN LLP and THE RINALDO LAW FIRM, by way of this First Amended Complaint against the above-named Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the laws of the State of New Jersey, for the wrongful acts of Defendants Corizon, Inc., f/k/a Correctional Medical Services, Inc. ("CMS"), David Meeker, Dr. Allan Martin, Dr. Lionel Anicette, Dr. Yasser Soliman and "John Does" #1-5 (said names being fictitious, as the true names are presently unknown), all acting under color of state law and pursuant to their authority, in violation of Plaintiff's rights, as said rights are secured by the aforementioned statutes and the Constitutions of the State of New Jersey and the United States.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Eighth and Fourteenth Amendments to the United States Constitution, the common law of the State of New Jersey, and Article I, § 12 of the New Jersey Constitution.

3.      Jurisdiction is invoked herein pursuant to 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.  This Court also has jurisdiction over Plaintiff's claims arising from the laws of the State of New Jersey pursuant to 28 U.S.C. § 1367.

4.      This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a), because Plaintiff's claims herein exceed the sum or value of $75,000.00, and there is complete diversity of citizenship between Plaintiff and all Defendants.

5.     Pursuant to 28 U.S.C. § 1391, venue is properly laid in the District of New Jersey because all or a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district.

**TRIAL BY JURY**

6.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on each and every one of his claims as pled herein.

**PARTIES**

7.     Plaintiff Elvis Soto-Muniz is a 45 year-old male who resides and is domiciled in Staten Island, New York.   At all times relevant hereto, Plaintiff was committed to the care and custody of the New Jersey Department of Corrections ("NJDOC") and housed at the Central Reception and Assignment Facility ("CRAF") in Trenton, New Jersey and at South Woods State Prison ("SWSP") in Bridgeton, New Jersey, under inmate number 188876C.

8.     Defendant CMS is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at 12647 Olive Boulevard, St. Louis, Missouri.  Defendant CMS is in the business of providing healthcare services to incarcerated persons and, at all times relevant hereto, was under contract with the State of New Jersey/NJDOC to provide medical services to Plaintiff and other inmates at SWSP.

9.     At all times relevant hereto, CMS was the employer and/or principal of Defendants David Meeker, Allan Martin, Lionel Anicette and Yasser Soliman and acted under color of law through its employees and agents.

10.     At all times relevant hereto, Defendant David Meeker was the CMS Vice President of Operations for the State of New Jersey.  Defendant Meeker acted under color

of law in his individual capacity and within the course and scope of his employment with CMS.

11.     At all times relevant hereto, Defendant Dr. Allan Martin was a licensed physician in the State of New Jersey retained by CMS as an independent contractor physician and employed by CMS as Site Medical Director for SWSP.  Defendant Martin acted under color of law in his individual capacity, as a licensed physician, and within the course and scope of his employment by CMS.

12.     At all times relevant hereto, Defendant Dr. Lionel Anicette was employed by CMS as State Medical Director for the State of New Jersey, including SWSP. Defendant Anicette acted under color of law in his individual capacity and within the course and scope of his employment by CMS.

13.     At all times relevant hereto, Defendant Dr. Yasser Soliman was employed by CMS as Associate State Medical Director the State of New Jersey, including for SWSP.  Defendant Soliman acted under color of law in his individual capacity and within the course and scope of his employment by CMS.

14.     At all times relevant hereto, Defendants CMS, Meeker, Martin, Anisette and Soliman (the "CMS Defendants") were policymakers for Defendant CMS. Defendant CMS convened approximately four to five meetings per month which were attended by Defendants Meeker, Martin, Anicette and/or Soliman during which CMS policies were formulated and disseminated.  Defendants CMS, Meeker, Martin, Anisette and Soliman created or participated in the creation of the policies pursuant to which Plaintiff's constitutional rights were violated as set forth herein.

15.     At all times relevant hereto, Defendants Meeker, Martin, Anicette and Soliman acted pursuant to the actual and *de facto* custom, policy and procedure of Defendant CMS, although defendants conduct may have been at variance with the written policy of Defendant CMS.

16.     At all times relevant hereto, Defendants "John Doe" #1-5 (said names being fictitious, as the true names are presently unknown) were employees, entities, individuals or organizations which were responsible for Plaintiff's medical treatment while incarcerated at SWSP.

17.     At all times relevant hereto and in all their actions described herein, said Defendants were acting under color of the statutes, ordinances, regulations, policies, customs and usages of the State of New Jersey, the NJDOC, Defendant CMS, pursuant to their authority as employees, servants and agents of the NJDOC and/or CMS, and within the scope of employment and incidental to their otherwise lawful duties and functions as employees, servants, agents and medical practitioners.

18.     Defendant CMS and its agents were responsible for the hiring, training, supervision, discipline, retention and promotion of its employees, servants, agents and medical practitioners.

## **FACTS**

19.     Plaintiff has suffered from ulcerative colitis for several years.  Ulcerative colitis, also known as UC, is an inflammatory bowel disease that can cause long-lasting inflammation in part of the digestive tract.

20.     Symptoms of UC include bloody diarrhea, abdominal cramps and pain, fatigue, and significant weight loss.

21.     Symptoms of UC can be successfully managed through medication, diet and other non-surgical medical interventions.

22.     Complications of UC include severe bleeding, perforated colon, severe dehydration, kidney stones and toxic megacolon.  If UC symptoms cannot be controlled, a surgical removal of the colon and rectum may be required.

23.     Prior to July and August of 2008, Plaintiff's UC had been managed successfully by medication and, on occasion, professional medical intervention in a clinical or hospital setting.

24.     In 1996, Defendant CMS entered into a multi-year, multi-million dollar contract with the State of New Jersey to provide healthcare services to inmates in NJDOC facilities; this contract was periodically renewed and/or updated until its final expiration and non-renewal on or about September 30, 2008.

25.     Pursuant to Defendant CMS's NJDOC contract, and at all times relevant to the acts alleged herein, Defendants acted under color of state law and had a duty to provide adequate medical care to inmates in NJDOC custody.  This duty included, but was not limited to, careful, diligent and timely diagnosis and treatment of Plaintiff's medical needs and professional maintenance and review of Plaintiff's medical records.

26.     Defendants were aware of these obligations and that failure to provide adequate medical care to prisoners such as Plaintiff constituted a violation of clearly established constitutional rights of which a reasonable person would have known.

27.     On or about May 8, 2008, Plaintiff Elvis Soto-Muniz, then approximately 41 years of age, presented at Bergen Regional Medical Center ("BRMC") Emergency Room with acute symptoms of ulcerative colitis and was admitted for treatment.  Plaintiff

received, *inter alia*, intravenous ("IV") steroids and antibiotics as well as daily hemoglobin and hematocrit therapy; Plaintiff responded very well to this treatment and was thereafter discharged from BRMC.

28.     On or about May 16, 2008, Plaintiff was sentenced in connection with a criminal matter and housed at Bergen County Jail.

29.     On or about July 10, 2008, Plaintiff was transferred to the custody of the New Jersey State Department of Corrections ("NJDOC") and received at NJDOC's Central Reception and Assignment Facility ("CRAF").  At CRAF Nursing Intake, Giselle Williams, LPN, noted in Plaintiff's electronic medical record ("EMR" or "chart") that he suffers from ulcerative colitis and that he had been hospitalized two months prior; Sharon Levin, RN, NP, further noted Plaintiff's UC and related symptoms in the EMR.

30.     On or about July 15, 2008, Phyllis Hewins, RN, noted in Plaintiff's EMR that he was seen at CRAF sick call for nausea and cramping and that Plaintiff reported that his ulcerative colitis medications were not working.

31.     On or about July 16, 2008, Grace Melendez, MD, noted in Plaintiff's EMR that he was seen at CRAF for sick call.  Dr. Melendez further noted in Plaintiff's chart that he had a seven-year history of ulcerative colitis with multiple hospitalizations. In her assessment, Dr. Melendez explicitly noted in the EMR that Plaintiff appeared "chronically ill" was suffering from an "acute exacerbation of Crohn [;] needs IV hydration [;] … gi consult [;] (and that CRAF had) no infirmary bed but (Plaintiff was) accepted at southwood [sic] infirmary."

32.     Based on Dr. Melendez's medical assessment and the fact that no suitable infirmary bed was available at CRAF, Plaintiff was transferred to SWSP the very next

day, July 17, 2008, for the express purpose of being admitted to the SWSP infirmary and receiving IV hydration and other indicated treatment.

33.     On or about July 17, 2008, Plaintiff was transferred to SWSP, whereupon he was evaluated at Intake by Jennifer Kuty, RN, and placed in the SWSP infirmary. Plaintiff's weight was recorded in his EMR admissions assessment as being 139 pounds with a BMI (body mass index) of 21.21.

34.     On or about July 17, 2008, following Plaintiff's admission to the SWSP infirmary, Gail Willet, RN, noted Plaintiff's present symptoms and history of ulcerative colitis during infirmary rounds; Nurse Willet further noted that CMS medical staff attempted to start IV fluids but abandoned the effort after several failed attempts.

35.     On or about July 17, 2008, Lisa Renee Mills, RN, NP, directed via telephone order that Plaintiff be treated with oral and IV fluids for dehydration; this direction was noted in Plaintiff's EMR by Clevelyn Ricalde, RN.

36.     Although he was ordinarily present in the SWSP infirmary during business hours on weekdays in his capacity as Medical Director, Defendant Dr. Martin took the day off on July 17, 2008, to celebrate his birthday.

37.     On or about the early morning of July 18, 2008, Linda Bigay, RN, attempted unsuccessfully to start Plaintiff on IV hydration at SWSP ECU Infirmary during rounds.  Nurse Bigay recorded Plaintiff's weight as 139 pounds and noted "increased" symptoms of ulcerative colitis in his EMR.  James R. Welch, RN, also noted Plaintiff's weight as 139 pounds as well as ongoing gastrointestinal problems during rounds in the infirmary later that day.

38.     Plaintiff was thereafter seen on or about July 18, 2008, by Defendant Dr. Allan Martin for the first time; Defendant Martin noted Plaintiff's specific complaints related to symptoms of UC in the EMR chart.  Plaintiff was seen again by Nurse Clevelyn Ricalde during infirmary rounds on or about July 18, 2008.

39.     Plaintiff was observed by Nurse Mildred Johansen at infirmary rounds during the early morning hours on or about July 19, 2008.  During later infirmary rounds the same day, Nurse Stephanie Smith noted Plaintiff's ongoing complaints of difficulty eating, abdominal pain and diarrhea.  Plaintiff was seen later on the same date by Nurse Christina Gray during infirmary rounds in the ECU.

40.     Plaintiff was seen by Nurse James R. Welch on or about July 20, 2008, during the early morning hours.  Nurse Welch noted Plaintiff's complaint of abdominal pain and diarrhea with blood and recorded Plaintiff's weight as 139 pounds in his EMR. Plaintiff was seen later the same day by Nurse Stephanie Smith, who noted that he was "weak appearing" and "tolerating little foods" in the EMR.  Plaintiff was thereafter seen later on the same day by Nurse Christina Gray, who noted Plaintiff's complaints of "inability to eat" as well as "UC and continued diarrhea" in his EMR.

41.     Plaintiff was seen by Nurse Linda Bigay at infirmary rounds on or about July 21, 2008, during the early morning hours.  Plaintiff was thereafter seen later the same day by Defendant Dr. Martin who, upon information and belief, prescribed Plaintiff a nutritional supplement.  Plaintiff was seen later the same day by Nurse James R. Welch before ultimately being seen again by Defendant Dr. Martin.   Dr. Martin noted in Plaintiff's EMR chart that Plaintiff complained of diarrhea, fatigue, malaise, melena, bloody stools, and abdominal pain.

42.     Despite observing and noting Plaintiff's obvious medical needs, Dr. Martin discharged Plaintiff to the prison's general population on July 21, 2008; Plaintiff was thus discharged from the infirmary a mere three days after having arrived with orders to be placed in the infirmary, given IV hydration and medication and a lab test, without having been provided any IV treatment and without medical staff obtaining the necessary blood sample for laboratory analysis.

43.     On or about July 23, 2008, Sharon Levin, RN, NP, entered a summary of the consultation report from Bergen Regional Medical Center ("BRMC") reflecting Plaintiff's hospitalization and positive response to treatment in May of 2008 into Plaintiff's EMR medical chart.

44.     On or about July 24, 2008, Narrissa Pierce, RN, entered a chart note for chart review into Plaintiff's EMR medical chart.

45.     On or about July 25, 2008, Plaintiff was seen at sick call by Mary Ellen Green, RN for rectal bleeding, weakness and poor appetite.  Nurse Green noted in Plaintiff's chart that Nurse Practitioner F. Green spoke with Plaintiff regarding his treatment plan and a GI consult and labs which had purportedly been ordered.

46.     Plaintiff's medical records by CMS personnel working under the supervision of Defendant Dr. Martin from July 21 to 31, 2008, are devoid of and/or seriously deficient with respect to notations documenting Plaintiff's weight.

47.     At some point between July 25, 2008, and August 1, 2008, inclusive, one of the CMS nurses was able to obtain blood sample from Plaintiff which was then sent for laboratory analysis.

48.     On or about August 1, 2008, Plaintiff was transferred from general population to the ECU Infirmary for medical management by Nurse Practitioner Fran Green.  Nurse Practitioner Green signed an EMR note documenting this transfer at approximately 8:54 a.m.

49.     Later on the same day, August 1, 2008, during infirmary rounds, Defendant Dr. Martin transferred Plaintiff right back to the general population despite observing that Plaintiff appeared "chronically ill" and that Plaintiff "maintains that he has bloody diarrhea several times a day"; Defendant Dr. Martin's EMR note further observed that Plaintiff complained of weight loss, and that his weight had in fact dropped from 148 pounds to 137 pounds since July 10, 2008.

50.     On or about August 1, 2008, results from Plaintiff's latest laboratory blood work were available.  The labs indicated that, compared to his July 11, 2008, lab results, Plaintiff's white blood cell count was elevated, his hemoglobin had dropped from 12.9 to 8.5, and his hematocrit had dropped from 43 to 28.  These results were indicative of inflammation, significant blood loss and significant chronic bleeding.  Defendant Dr. Martin signed off on this lab report on August 1, 2008, at 7:24 p.m., less than six hours after he had signed the EMR note transferring Plaintiff back to general population from the infirmary.

51.     In addition to the other obvious indicia of Plaintiff's serious medical needs and acute UC symptoms, Defendant Dr. Martin was aware from the August 1, 2008, lab results that Plaintiff was at an unreasonably elevated risk of serious and permanent medical harm in connection with these lab results, but took no steps whatsoever to address Plaintiff's serious medical needs.

52.     After being returned to general population by Defendant Dr. Martin yet again on August 1, 2008, Plaintiff's health continued to rapidly deteriorate.  Plaintiff continued to seek medical attention by filling out sick call slips and requesting assistance from NJDOC and CMS staff.

53.     On or about August 5, 2008, Plaintiff was seen at sick call for weight loss, dehydration and kidney pain by Nurse Mary Ellen Green.  Plaintiff was given a wheelchair and NJDOC was notified that Plaintiff required a lower bunk due to weakness and malaise.  Nurse Green noted Plaintiff's weight at 130 pounds and described Plaintiff in the EMR chart as "[c]olor sallow and face drawn in appearance with dark circles and sunken eyes."

54.     During Plaintiff's visits with Defendant Dr. Martin in July and early August of 2008, Plaintiff repeatedly and persistently informed Defendant Martin that he needed additional medical care and that the purported treatment he was receiving was not working.

55.     During Plaintiff's visits with Defendant Martin in July and early August of 2008, Dr. Martin was verbally abusive of Plaintiff, yelled and swore at Plaintiff, and told Plaintiff that he would not be sent to a hospital.

56.     In July and early August of 2008, Defendant Martin ignored and was deliberately indifferent to Plaintiff's serious medical needs, refused to refer Plaintiff to a specialist, send him to a hospital or provide appropriate treatment in retaliation against Plaintiff for his expression and speech regarding, *inter alia*, his need for medical treatment.   As a result of this retaliation, Plaintiff's speech and expression were stifled

inasmuch as Plaintiff's physical condition markedly deteriorated, rendering him essentially incapable of speaking and writing effectively.

57.     As a result of Defendants' unconstitutional acts, Plaintiff's condition became so severe that or about August 6, 2008, Nurse Practitioner Fran Green sent Plaintiff to the emergency room at Saint Francis Medical Center for evaluation and treatment.

58.     Having only been at SWSP for only 20 days before being sent to St. Francis Hospital's emergency room, and having been debilitated for many of those days, there was no opportunity for Plaintiff to exhaust any purported administrative remedies relative to the CMS Defendants' failure to provide adequate treatment for his obvious and serious medical needs or retaliation against Plaintiff for expressing his needs prior to the point that his condition deteriorated irreversibly.

59.     Upon presenting for treatment at St. Francis Medical Center on or about August 6, 2008, Plaintiff received over three units of blood in a transfusion.

60.     After receiving the blood transfusion, Plaintiff was informed that due to the extreme dehydration and the lack of treatment for his chronic rectal bleeding over a protracted period of time, he now had no option than to have a two-part surgery for a total colectomy with omentectomy - removal of his colon and rectum in their entirety.

61.     Because Plaintiff was so weak and undernourished, the staff at St. Francis Medical Center had to stabilize Plaintiff's health condition before the first of two surgeries could be performed.  Plaintiff spent more than a week recuperating and being treated for severe dehydration, anemia and ulcerative colitis, among other things, before his first surgery was performed on or about August 15, 2008.

62.     During his fist surgery on or about August 15, 2008, Plaintiff underwent a total abdominal colectomy and endoileostomy. Plaintiff received an ileostomy appliance—a bag attached to the outside of his body to collect fecal matter.

63.     After the first surgery, Plaintiff was returned to South Woods State Prison to recuperate and await his second planned surgery on or about November 21, 2008. During this second surgery, Plaintiff received a proctocolectomy (removal of his rectum), a loop ileostomy and treatment for complications from the first surgery.

64.     After completion of the two surgeries, Plaintiff suffered from a pulmonary embolism (blood clot), infarction, pulmonary atelectasis (collapse) in his lungs and received a filter in the artery in his leg. Plaintiff suffered further dehydration while recuperating at SWSP, which resulted in kidney failure, severe septicemia, septic shock, candidasis of the esophagus, and paralytic ileus.

65.     The failures of Defendant CMS and the other Defendants to adhere to their contractual obligations with respect to the provision of adequate medical services to inmates entrusted to its care were a matter of public record. Indeed, in or around October of 2007, the State of New Jersey Office of the Inspector General released a report detailing results of its investigation into apparent contractual non-compliance by CMS. The Office of the Inspector General thereafter released a second report in December of 2008.

66.     In the spring of 2008, CMS was informed by the State of New Jersey/NJDOC that its contract would not be renewed.

67.     By letter dated July 31, 2008, the New Jersey Division of Purchase and Property advised CMS that the State intended to assess the company liquidated damages in an amount exceeding three million dollars in connection with its contractual breaches.

68.     In response to the loss of its multi-million dollar contract with the State of New Jersey and the loss of revenue associated with the State's imposition of liquidated damages, CMS further tightened its existing unconstitutional policy of restricting access to specialists, outside medical providers, and non-formulary medications for non-medical reasons in order to save money at the expense of inmates' health and well-being.

69.     In further response to the loss of its multi-million dollar contract with the State of New Jersey and the loss of revenue associated with the State's imposition of liquidated damages, CMS protested the State's choice of UMDNJ (the University of Medicine and Dentistry of New Jersey) and initiated litigation against the State.

70.     As a result of Defendants' unconstitutional policies and actions, Plaintiff suffered extreme pain and discomfort, extended periods of rectal bleeding, nausea, vomiting, loss of his colon and rectum, kidney failure, anemia and weight loss of over 40 pounds. Plaintiff further endured multiple surgeries, suffers from difficulty in gaining and maintaining weight, is burdened with an ileostomy bag, and suffers severe and ongoing mental and emotional damage.

71.     As a result of Defendants' unconstitutional policies and actions, Plaintiff's quality of life has been decimated and he will suffer related health issues for the rest of his life.

72.     In particular, as a direct result of Defendants' unconstitutional policies and actions, Plaintiff has sustained the following severe injuries:

- Acute and chronic infection with inadequate treatment and bleeding of the rectum, requiring the Plaintiff to spend more than six months undergoing two consecutive surgeries, including multiple emergency room visits and months of rehabilitation;
- Acute exacerbation of ulcerative colitis necessitating a total colectomy with omentectomy;
- Candidasis of the esophagus;
- Bacteremia, severe sepsis and septic shock;
- Septicemic due to E. Coli;
- Triple lumen catheter infection;
- Chronic untreated dehydration, nausea, vomiting and anemia;
- Renal failure and weight loss;
- Dysphagia;
- Odynophagia;
- Renal failure secondary to sepsis;
- Paralytic ileus;
- Pulmonary embolism and infarction;
- Atelectasis;
- Chronic pulmonary weakness, pain and tenderness

73. Moreover, the aforesaid injuries to Plaintiff have required him to ingest the medications, including, but not limited to, the following: Xopenex and Atrovent nebulizer; Lopressor; Nexium; Lovenex; Dilaudid; and Percocet.

74. The aforesaid injuries to Plaintiff will be permanent, and as a result thereof, Plaintiff will have permanent pain, discomfort, diminished range of motion, severe limitation and loss of function, power and use, stiffness, irritation, tenderness and soreness to and about the aforesaid injured parts and areas.

75. That the foregoing injuries directly affected the skin, bones, tendons, veins, tissues, nerves, muscles, joints, blood vessels and ligaments of the injured parts

and produced functional and organic disturbances, sympathetic and radiating to surrounding areas.

76.     That the injuries abovementioned and to the adjacent and surrounding areas hereinabove mentioned and each of the effects of these injuries as hereinabove mentioned are permanent.  That, solely by reason of the aforesaid, Plaintiff sustained serious and severe personal injuries, including, but not limited to, acute and advanced infection of the esophagus, colon, rectum, lungs and kidneys, which necessitated multiple long-term hospitalizations and extensive rehabilitation.

77.     In addition to the aforementioned constitutional violations, Defendants failed to properly maintain Plaintiff's medical records, to properly access and review the records of Plaintiff's medical care, and to properly supervise their employees and agents, all in violation of the Eighth and Fourteenth Amendments to the Constitution.

78.     Furthermore, Defendants created and acted pursuant to a policy of denying or delaying referrals to qualified physicians based on non-medical factors including, but not limited to, financial concerns occasioned by the mismanagement and resulting non-renewal of the NJDOC contract.  Accordingly, Defendants endangered Plaintiff's welfare by engaging in a course of conduct that created an unreasonable risk to Plaintiff's health as described herein.

79.     Defendants knew or should have known based upon Plaintiff's medical charts, file and history that Defendants' policies and practices created an unreasonable risk to Plaintiff's health and civil liberties.  Nonetheless, Defendants remained indifferent to that risk by repeatedly sending Plaintiff back to the general prison population and failing to provide proper medical treatment.  Defendants' unconstitutional policies were

the actual cause and the driving force behind the serious medical and constitutional injuries endured by the Plaintiff.

80.    As described herein, Defendants' failed to adequately respond to Plaintiff's repeated requests for medical attention and this pattern of deliberate indifference under Defendants' existing policies and practices is what caused harm to the Plaintiff-- physically, psychologically and constitutionally.  The risk of harm in which Plaintiff was exposed to, and the injuries he ultimately sustained, was significant and was all as a result of the direct and proximate causation of the practices and policies employed by the Defendants.

**FIRST CLAIM FOR RELIEF:**
**CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH**
**AMENDMENT OF THE U.S. CONSTITUTION**

81.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs above with the same force and effect as if fully set forth herein.

82.    During Plaintiff's incarceration with NJDOC in July 2008 and thereafter, Defendants were responsible for providing Plaintiff with medical care.  Defendants' duty to provide Plaintiff with adequate medical care, including maintenance and review of Plaintiff's medical records, was non-delegable and the failure to do so amounted to a violation of clearly established constitutional rights of which a reasonable person would have known.

83.    Plaintiff suffers from serious medical needs, including ulcerative colitis, which were diagnosed and documented by Defendants.

84.    Despite having knowledge of Plaintiff's serious medical needs, the CMS Defendants deliberately and intentionally failed to provide the necessary treatment for

Plaintiff's ulcerative colitis and failed to adequately maintain and review Plaintiff's medical records in connection therewith, and thereby violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

85.     Defendants' failure to provide the necessary treatment resulted in significant physical and psychological injury to Plaintiff, including surgery to remove his colon and rectum, constituting unnecessary and wanton infliction of pain and suffering.

86.     At all times relevant hereto, the CMS Defendants knew or should have known of the constitutional deficiencies in the medical care provided to Plaintiff at SWSP and the attendant risks and injuries resulting therefrom.

87.     The CMS Defendants acted pursuant to their policy, custom and practice of denying and delaying expensive referrals and treatments in favor of less expensive and ineffective measures including, but not limited to, ignoring the serious medical needs of inmates.

88.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

89.     All of the aforementioned acts deprived Plaintiff Elvis Soto-Muniz, of his rights, privileges and immunities guaranteed to citizens of the United States by the Eighth and Fourteenth Amendments to the Constitution of the United States and in violation of 42 U.S.C. § 1983.

90.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as employees of Defendant CMS and pursuant to a contract with the State of New Jersey.

91.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as employees, pursuant to the customs, usages, practices, procedures, and rules of CMS and pursuant to a contract with the State of New Jersey.

92.     By these actions, these Defendants have deprived Plaintiff of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which the Defendants are liable in the individual and official capacities.

**SECOND CLAIM FOR RELIEF:**
**<u>RETALIATION AGAINST FREE EXPRESSION IN VIOLATION OF THE</u>**
**<u>FIRST AMENDMENT OF THE U.S. CONSTITUTION</u>**

93.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs above with the same force and effect as if fully set forth herein.

94.     During Plaintiff's incarceration with NJDOC in July 2008 and thereafter, Defendants were responsible for providing Plaintiff with medical care.  Defendants had a duty not to withhold adequate medical care from Plaintiff in retaliation for his exercise of free speech, and were aware that such withholding amounted to a violation of clearly established constitutional rights of which a reasonable person would have known.

95.     Plaintiff expressed his need for medical attention to address Defendants on numerous occasions; in retaliation against Plaintiff for his entreaties, the CMS Defendants ignored Plaintiff's serious medical needs and failed to provide the necessary treatment for same, thereby violating Plaintiff's First Amendment right to freedom of expression.

96.     Defendants' retaliatory failure to provide the necessary medical treatment resulted in stifling Plaintiff's expression by rendering him so weak and debilitated that he could not communicate effectively.

97.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

98.     All of the aforementioned acts deprived Plaintiff Elvis Soto-Muniz of his rights, privileges and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States and in violation of 42 U.S.C. § 1983.

99.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as employees of Defendant CMS and pursuant to a contract with the State of New Jersey.

100.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as employees, pursuant to the customs, usages, practices, procedures, and rules of CMS and pursuant to a contract with the State of New Jersey.

101.    By these actions, these Defendants have deprived Plaintiff of rights secured by the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which the Defendants are liable in the individual and official capacities.

**THIRD CLAIM FOR RELIEF:**
**ENTITY LIABILITY FOR CONSTITUTIONAL VIOLATIONS**

102.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs above with the same force and effect as if fully set forth herein.

103.    The CMS Defendants and Defendants "John Doe" #1-5 (said names being fictitious, as the true names are presently unknown) engaged in cruel and unusual punishment with respect to Plaintiff Elvis Soto-Muniz, despite a complete lack of cause against him, notwithstanding their knowledge that said violations would jeopardize Plaintiff's well-being, safety and constitutional rights.

104.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as employees and officials, with the entire actual and/or apparent authority attendant thereto.

105.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as employees and officials pursuant to the customs, policies, usages, practices, procedures and rules of Defendant CMS, all under the supervision of ranking supervisors of said departments.

106.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant CMS included, but were no limited to, denying or delaying more expensive medical treatments for non-medical reasons, refusing to make necessary referrals to specialists or to use non-formulary medications, understaffing NJDOC facilities in violation of the contractual and constitutional obligations, failing to adequately confer with treating physicians from transferring facilities as nominally required by Defendant CMS's policy and/or contractual obligations, failing to adequately supervise and review the work of subordinate medical personnel, and failure to adequately ensure the maintenance and timely review of adequate medical records.

107.    The foregoing customs, policies, usages, practices, procedures and rules of Defendant CMS constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiff Elvis Soto-Muniz.

108.    The foregoing customs, policies, usages, practices, procedures and rules of the CMS Defendants were the direct and proximate cause of the constitutional violations suffered by Plaintiff Elvis Soto-Muniz, as alleged herein.

109.    The foregoing customs, policies, usages, practices, procedures and rules of the CMS Defendants were the moving force behind the constitutional violations suffered by Plaintiff Elvis Soto-Muniz, as alleged herein.

110.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff Elvis Soto-Muniz.

111.    Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate employees, and were directly responsible for the violation of Plaintiff's constitutional rights.

112.    Defendants have pursued a policy and custom of deliberate indifference to the rights of persons in their domain who suffer violation of their right to expression and freedom from retaliation for expressing medical needs, cruel and unusual punishment and deprivation of due process of law in violation of the First, Eighth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983, and the Constitution and laws of the State of New Jersey.

113.    All of the foregoing acts by Defendants deprived Plaintiff Elvis Soto-Muniz, of federally protected rights, including, but not limited to, the right to expression

of his medical needs without retaliation; not to have cruel and unusual punishment imposed upon him; and not to be deprived of life without due process of law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and prays for the following relief, jointly and severally, against the Defendants:

1.  Special and compensatory damages in the amount of two million and five hundred thousand dollars ($2,500,000.00);

2.  Punitive damages in the amount of two million and five hundred thousand dollars ($2,500,000.00);

3.  Reasonable attorney's fees and costs; and

4.  Reasonable pre- and post- judgment interest on all monetary awards to the extent permitted under applicable law; and

5.  Such other and further relief as this Court deems just and proper.

DATED:          Summit, New Jersey            Respectfully submitted,
                October 5, 2012

                                              */s/ Richard P. Rinaldo, Esq.*
                                              **THE RINALDO LAW FIRM**
                                              60 Morris Tpk., Suite 3B
                                              Summit, NJ 07901
                                              Tel: 973-346-8700
                                              Fax: 973-467-1178

                                              **REESE RICHMAN LLP**
                                              Kim E. Richman, Esq.
                                              Maurice L. Hudson, Esq.
                                              Jason C. Hardy, Esq.

                                              ***Attorneys for Plaintiff Elvis Soto-Muniz***

## <u>VERIFICATION AND CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I, Richard P. Rinaldo, Esq., attorney for Plaintiff, in accordance with L. Civ. R. 11.2, hereby certify pursuant to 28 U.S.C. § 1746, that to the best of my knowledge, the matter in controversy in the above-captioned civil action is not the subject of any other action pending in any court, nor is it the subject of any pending arbitration or administrative proceeding. I certify under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

*/s/ Richard P. Rinaldo, Esq.*
**THE RINALDO LAW FIRM**

*Attorney for Plaintiff*

Dated: October 5, 2012