**MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C.**
**Sean X. Kelly, Esquire (03456-1998)**       **ATTORNEYS FOR DEFENDANT**
**Sean Robins, Esquire (01953-1993)**       **Corizon, Inc., f/k/a Correctional Medical**
**6981 N. Park Drive**                    **Services, Inc. (CMS), David Meeker,**
**Suite 300**                             **Allan Martin, M.D., Lionel Anicette,**
**Pennsauken, NJ   08109**                **M.D. and Yasser Soliman, M.D.**
**(856) 663-4300**

**431-88326 (SR)**

| | |
|---|---|
| **Elvis Soto-Muniz** | **UNITED STATES DISTRICT COURT**<br>**DISTRICT OF NEW JERSEY**<br>**CAMDEN VICINAGE** |
| **vs.** | |
| **Corizon, Inc., f/k/a Correctional Medical Services, Inc. (CMS), David Meeker, Allan Martin, M.D., Lionel Anicette, M.D. and Yasser Soliman, M.D.** | **DOCKET NO.  1:2010-cv-03617**<br><br>**CIVIL ACTION** |

**BRIEF OF DEFENDANTS, CORIZON, INC.,**
**F/K/A CORRECTIONAL MEDICAL SERVICES, INC., ALLAN MARTIN, M.D.,**
**LIONEL ANICETTE, M.D., YASSER SOLIMAN, M.D. AND DAVID MEEKER,**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

On The Brief:

Sean Robins, Esquire
**MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C.**
6981 N. Park Drive
Cooper River West - Suite 300
Pennsauken, NJ  08109

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………...…..iv

PRELIMINARY STATEMENT AND PROCEDURAL HISTORY …………………………..1

STATEMENT OF UNDISPUTED FACTS ……………………………………………………….2

STANDARD TO BE APPLIED ON SUMMARY JUDGMENT………………………………2

LAW AND ANALYSIS …………………………………………………………………………..5

**I.      THE PLAINTIFF HAS FAILED TO DEMONSTRATE THAT MOVING DEFENDANTS, CORIZON, INC., F/K/A CORRECTIONAL MEDICAL SERVICES, INC., ALLAN MARTIN, M.D., LIONEL ANICETTE, M.D., YASSER SOLIMAN, M.D. AND DAVID MEEKER, ACTED WITH DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED, PURSUANT TO 42 U.S.C. §1983, AND HIS CLAIMS SHOULD THEREFORE BE DISMISSED WITH PREJUDICE ………………………………………………………………….5**

**II.     THE EXISTENCE OF ANY DISAGREEMENT AS TO THE COURSE OF THE MEDICAL TREATMENT PROVIDED TO THE PLAINTIFF FAILS AS A MATTER OF LAW TO ESTABLISH A CLAIM FOR DELIBERATE INDIFFERENCE UNDER 42 U.S.C. §1983.  ACCORDINGLY, THE PLAINTIFFS CLAIMS SHOULD BE DISMISSED WITH PREJUDICE …………………..…...20**

**III.    THE PLAINTIFF HAS FAILED TO DEMONSTRATE THE EXISTENCE OF A CUSTOM OR POLICY ON THE PART OF MOVING DEFENDANTS, CORIZON, INC., F/K/A CORRECTIONAL MEDICAL SERVICES, INC., LIONEL ANICETTE, M.D., YASSER SOLIMAN, M.D. AND DAVID MEEKER, WHICH RESULTED IN THE ALLEGED DELIBERATE INDIFFERENCE TO PLAINTIFF'S SERIOUS MEDICAL NEEDS.  THEREFORE, PLAINTIFFS' CLAIMS AGAINST THEM SHOULD BE DISMISSED WITH PREJUDICE ……………………………………………………………………26**

**IV.     TO THE EXTENT THAT THE PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM RELIES UPON ALLEGATIONS OF *RESPONDEAT SUPERIOR* LIABILITY, NO SUCH CLAIM EXISTS UNDER 42 U.S.C. §1983, AND PLAINTIFF'S CLAIMS AS AGAINST CMS, ANICETTE, SOLIMAN AND MEEKER, SHOULD THEREFORE BE DISMISSED WITH PREJUDICE …..32**

**V.      THE PLAINTIFF FAILED TO EXHAUST THE AVAILABLE ADMINISTRATIVE REMEDIES, PURSUANT TO THE PRISON LITIGATION REFORM ACT, 42 U.S.C. §1997E(A), WITH REGARD TO HIS CLAIMS AGAINST MOVING DEFENDANTS, AND HIS CLAIMS THEREFORE SHOULD BE DISMISSED WITH PREJUDICE …………………………………35**

**VI.    THE PLAINTIFF HAS FAILED TO ESTABLISH THAT THE ACTIONS OF THE DEFENDANTS VIOLATED PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT AND THEREFORE PLAINTIFF'S CLAIM SHOULD BE DISMISSED WITH PREJUDICE** …………………………………………………...40

CONCLUSION……………………………………………………………………43

**TABLE OF AUTHORITIES**

## CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 243 (1986)…………………………………….……2

Andrews v. Camden County, 95 F. Supp.2d 217 (D.N.J. 2000)…………………………….8

Bailey-El v. Fed. Bur. Of Prisons, 246 Fed.Appx. 105 (3d Cir. 2007)…………………….35

Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995)……………………………………..33

Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001)……………………………………7

Benson v. Cady, 761 F.2d 335 (7th Cir. 1985)……………………………………………….42

Board of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397 (1997)……..27

Booth v. Churner, 532 U.S. 731 (2001)………………………………………………………35

Cain v. Lane, 857 F.2d 1139 (7th Cir. 1988)………………………………………………42

Carter v. McGrady, 292 F.3d 152 (3d Cir. 2002)……………………………………………41

Celotex Corp. v. Catrett, 106 S.Ct. 2548, 477 U.S. 317 (1986)………………………..…..….2

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989)…………………………………………..27

City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985)…………………………………………27

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988)…………………………………………..27

Coletta v. Board of Freeholders of Ocean County, 2007 U.S. Dist. LEXIS 2717
(3d Cir. 2007)…………………………………………………………………………….………7

Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002)…………………………………………36

Cruz v. Ward, 558 F.2d 658 (2nd Cir. 1977) cert. den., 434 U.S. 1018 (1978)…..……………22

Daniels v. Williams, 474 U.S. 327 (1986)……………………………………………...…20

Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993)…………………………………………...32

Estelle v. Gamble, 429 U.S. 97 (1976)……………………………………….……..5-6, 8-9

Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994)……………………………………6-8

iv

Farmer v. Carlson, 685 F.Supp. 1335 (M.D. Pa. 1988)……………………………….…..20-21

Gardner v. Zaunbrecher, No. 95-CV-1543, 1996 W.L. 507072 (N.D. N.Y. Sept. 4, 1996)…….22

Glenn v. Diddle, 252 Fed. Appx. 493 (3d Cir. 2007)………………………………...…..41-42

Holly v. Rapone, 476 F.Supp. 226 (E.D. Pa. 1979)………………………………………….20

Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir. 1979)………………………9

Jackson v. Ivers, 244 Fed.Appx. 508 (3d Cir. 2007)……………………………………………35

Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996)………………………………………………27

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)……..……..2

Mitchell v. Horn, 318 F.3d 523 (3d Cir. 2003)…………………………………………………..41

Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978)…………………...26, 32

Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987) cert. den., 486 U.S. 106 (1988)…………………………………………………………………20

Natale v. Camden County Correctional Facility, 318 F.3d 575 (3d Cir. 2003)……...…8, 26-27, 32

Norris v. Frame, 585 F.2d 1183 (3d Cir. 1978)…………………………………………………20

Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000)…………………………………………………36

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)……………………………………...…27

Peterson v. Davis, 551 F. Supp. 137 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984)…………………………………………………………………………………8

Polk County v. Dodson, 454 U.S. 312 (1981)…………………………………………………32

Porter v. Nussle, 534 U.S. 516 (2002)…………………………………………………………35

Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) cert. den., 450 U.S. 1041 (1981)……….22

Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001)……………………………………………..41

Roach v. Kligman, 412 F.Supp. 421 (E.D. Pa. 1976)……………………………………..20

Robinson v. City of Pittsburgh, 120 F.3d 1285 (3d Cir. 1997)……………………………..32-33

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)…………………………………………32-33

Rodriguez v. Joyce, 693 F.Supp. 1250 (D.Me. 1988)…………………………………………..21

Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999)…………………………………………………..7-8

Sanders v. Vigil, 917 F.2d 28, 1990 W.L. 160964 (9th Cir. 1990)…………………………22

Smith v. Marcantonio, 910 F.2d 500 (8th Cir. 1990)…………………………………………..21

Spruill v. Gillis, 372 F.3d at 218 (3d. Cir. 2004)……………………………………………..35-36

Warren v. Pennsylvania, 316 Fed.Appx. 109 (3d Cir. 2008)…………………………………35

White v. Napoleon, 897 F.2d 103 (3d Cir. 1990)……………………………………………...8-9

Williams v. Borough of West Chester, Pa., 891 F.2d 458 (3d Cir. 1989)……………………3-4

**STATUTES**

42 U.S.C. §1983……………………………………………….………..5, 7, 20, 22, 24, 26, 32

42 U.S.C. §1997e(a)…………………………………………………………………35-36, 38-39

U.S. Const., Amend. 1……………………………………………………………………..40

## PRELIMINARY STATEMENT AND PROCEDURAL HISTORY

The Plaintiff, Elvis Soto-Muniz, commenced this matter with the filing of a Complaint in the United States District Court for the Eastern District of New York, Docket No. cv10-1980, on April 30, 2010.  (A true and correct copy of Plaintiff's Complaint is attached hereto as Ex. "A")  On July 15, 2010, by Order of the Eastern District of New York, Plaintiff's action was electronically transferred to the United States District Court for the District of New Jersey.  (See Docket entry dated July 15, 2010)

Originally named in the Plaintiff's Complaint was Dr. Allan Martin, the New Jersey Department of Corrections, South Woods State Prison, and "The Health Services Unit."

On August 12, 2010, Defendants, New Jersey Department of Corrections  ("NJ-DOC"), South Woods State Prison, and "The Health Services Unit," filed a Motion to dismiss.  (Docket No. 13)  On October 18, 2010, Plaintiff filed a notice of voluntary dismissal, dismissing the New Jersey Department of Corrections, South Woods State Prison and "The Health Services Unit," at which time these defendants were terminated.  (See Docket No. 24)

Following the pursuit by Plaintiff of a Motion to Amend, the Plaintiff filed an Amended Complaint on October 5, 2012.  (A true and correct copy of Plaintiff's Amended Complaint is attached hereto as Ex. "B".

Following extensive discovery in this matter, documentary, testimonial and expert, Moving defendants, Corizon, Inc., F/K/A Correctional Medical Services, Inc., Allan Martin, M.D., Lionel Anicette, M.D.., Yasser Soliman, M.D. and David Meeker, hereby file the within motion for Summary Judgment, and respectfully request the entry of judgment in their favor, and against the Plaintiff.

## STATEMENT OF UNDISPUTED FACTS

See "Statement of Uncontested Facts of Defendants, Corizon, Inc., F/K/A Correctional Medical Services, Inc., Allan Martin, M.D., Lionel Anicette, M.D.., Yasser Soliman, M.D. and David Meeker, in Support of Motion for Summary Judgment," (hereinafter "SUF"), filed concurrently with Defendants' Motion for Summary Judgment.

## STANDARD TO BE APPLIED ON SUMMARY JUDGMENT

In 1986 the Supreme Court of the United States radically changed the standard for summary judgment and in effect issued a directive to district courts to be more assertive in using this procedural tool to eliminate cases prior to trial. As the Supreme Court indicated in Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986), once the party seeking summary judgment has pointed out to the court the absence of a fact issue:

> . . . its opponent must do more than simply show that there is a metaphysical doubt as to the material facts...In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial'...where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'. 475 U.S. at 586-87.

Summary judgment must be granted unless the evidence construed in favor of the non-moving party is sufficient for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 243, 249-50 (1986). Granting summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553, 477 U.S. 317 (1986).

The United States Court of Appeals for the Third Circuit in <u>Williams v. Borough of West Chester, Pa.</u>, 891 F.2d 458 (3d Cir. 1989), recognized this drastic change in the standard for summary judgment when it stated:

> Since the Supreme Court decided its summary judgment trilogy, appellate courts have increasingly been called upon to engage in difficult line-drawing exercises to determine whether a non-moving party has adduced sufficient evidence to defeat a motion for summary judgment.  (<u>Id</u>. at 459)

The Court in that case was faced with a situation where the plaintiff had established a dispute as to a genuine issue of material fact.  The Court of Appeals upheld the district court's granting of summary judgment for the defendants.  The Court stated that although a dispute had been established plaintiff had failed to show that he could produce sufficient evidence to support a jury verdict in his favor.  In that case the plaintiff claimed that the decedent had committed suicide while in the custody of the West Chester police.  The decedent had previously been in the custody of the West Chester police on prior occasions.  A police sergeant of the West Chester police testified at his deposition that the decedent's suicidal tendencies were widely known at the West Chester police department.  The specific defendants who were charged with not taking appropriate precautions to prevent decedent's suicide denied knowing of the tendencies.  No direct evidence was established that they did know of his suicidal tendencies.  The defendant officers had served on a squad that had recorded the bizarre behavior of the decedent.  The Court indicated that the question was whether given the propensity of human beings to talk about bizarre behavior, a reasonable jury could find that the defendant officers knew about decedent's suicidal tendencies and whether the jury could find that they acted with deliberate indifference to the decedent's psychological condition by not following the West Chester's police's normal policy regarding belt removal.

The United States Court of Appeals for the Third Circuit held that although the case was extremely close it had to conclude that no reasonable jury could so find. The court indicated that circumstantial evidence could not support the plaintiff's case concerning a constitutional violation. The court concluded:

> Although the line we draw today is, as I have said, not easy to place, the line must be drawn somewhere, and somewhere that adequately protects the salutary policies underlying Rule 56. Of course the right to present one's claims to a jury provides competing, no less important policies to be considered, but the upshot of the Supreme Court's <u>summary judgment trilogy is the former must not be sacrificed entirely to the latter. The old scintilla rule, although it would make cases like this one far easier to decide, did just that. I concede, as I must, that plaintiffs have adduced some circumstantial evidence tending to show deliberate indifference. However, because the line we must draw depends entirely on context and differences in degree, 'some evidence is not necessarily enough to survive summary judgment</u>.

<u>Id</u>. at 891 F.2d at 466 (Emphasis added).

## LAW AND ANALYSIS

I.    **THE PLAINTIFF HAS FAILED TO DEMONSTRATE THAT MOVING DEFENDANTS, CORIZON, INC., F/K/A CORRECTIONAL MEDICAL SERVICES, INC., ALLAN MARTIN, M.D., LIONEL ANICETTE, M.D., YASSER SOLIMAN, M.D. AND DAVID MEEKER, ACTED WITH DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED, PURSUANT TO 42 U.S.C. §1983, AND HIS CLAIMS SHOULD THEREFORE BE DISMISSED WITH PREJUDICE**

To defeat Moving Defendants' Motion for Summary Judgment with respect to his claims for deliberate indifference pursuant to 42 U.S.C. §1983, the Plaintiff must show that he has sufficient evidence to support a jury verdict in his favor on both the objective and subjective prongs of the deliberate indifference standard.  That is, he must be able to demonstrate both that the alleged actions or omissions of Moving Defendants in responding to his medical needs were objectively deliberately indifferent to a serious medical need, and that the defendants had actual knowledge that their alleged actions or omissions presented a substantial risk of harm to him. The Plaintiff must make this showing in order to establish deliberate indifference to a serious medical need.  The undisputed evidence in this matter, however, demonstrates that the Plaintiff has failed to do so.

The United States Supreme Court in Estelle v. Gamble, 429 U.S. 97 (1976) has set forth the elements of a cause of action brought by a prisoner pursuant to 42 U.S.C. §1983 raising allegations of the infliction of cruel and unusual punishment based on medical care.  In upholding summary judgment in favor of the defendant/doctor in that case the Supreme Court stated:

> It suffices to note that the primary concern of the drafters was to prescribe 'tortures' and other 'barbarous methods of punishment'... it is safe to affirm that punishments of tortures...and all others in the same line of unnecessary cruelty, are forbidden by that amendment...We therefore conclude that deliberate indifference to

5

> the serious medical needs of prisoners constitutes the 'unnecessary
> and wanton infliction of pain'.  (citations omitted).

Id. at 102-104.

Examples of the "unnecessary and wanton infliction of pain", which constitute deliberate

indifference provided by the Supreme Court consists of the following:

> ...doctors choosing the easier and less efficacious treatment of
> throwing away the prisoner's ear and stitching the stump may be
> attributable to deliberate indifference... rather than an exercise of
> professional judgment...injection of penicillin with knowledge that
> prisoner was allergic, and refusal of doctor to treat allergic reaction
> ...prison physician refuses to administer the prescribed pain killer
> and renders leg surgery unsuccessful by requiring prisoner to stand
> despite contrary instructions of surgeon.  (citations omitted.)

Id. at 104 f.n. 10.

In Estelle v. Gamble, supra, the United States Supreme Court rejected a Constitutional

claim based on medical malpractice, stating:

> Similarly, in the medical context, an inadvertent failure to provide
> adequate medical care cannot be said to constitute an 'unnecessary
> and wanton infliction of pain' or to be 'repugnant to the conscience
> of mankind'.  Thus a complaint that a physician has been negligent
> in diagnosing or treating a medical condition does not state a valid
> claim of medical mistreatment under the Eighth Amendment.
> Medical malpractice does not become a constitutional violation
> merely because the victim is a prisoner.  In order to state a
> cognizable claim, a prisoner must allege acts or omissions
> sufficiently harmful to evidence deliberate indifference to serious
> medical needs.  It is only such indifference that can offend
> 'evolving standards of decency' in violation of the Eighth
> Amendment.  Id. at 106.

The United States Supreme Court has also defined the deliberate indifferent standard in

its opinion in Farmer v. Brennan, 114 S.Ct. 1970 (1994).   According to the Supreme Court,

deliberate indifference now requires a showing that prison medical staff were "subjectively"

aware of a substantial risk of harm to the prisoner.  Justice Souter, writing for the Court, stated:

> We reject [the] invitation to adopt an objective test for deliberate indifference.  We hold...that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety...<u>The official must be both aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference</u>. ...  [A]n official's failure to alleviate a significant risk that he should have perceived but did not...cannot under our cases be condemned as the infliction of punishment.

<u>Id</u>. at 114 S.Ct. at 1979. (Emphasis added).

Thus, under <u>Farmer</u>, 114 S.Ct. at 1979, the Plaintiff must show that moving defendants knew that their alleged actions would cause serious harm to him, and that they proceeded nonetheless.  42 U.S.C. §1983, requires that the defendant possess "subjective, not objective knowledge" as to the existence of an excessive (or substantial) risk.  <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 133 (3d Cir. 2001).  "[I]t is not sufficient that the official should have been aware."  <u>Id</u>.

The deliberate indifference standard presents a high threshold for a plaintiff to overcome. *Id*. at 105 - 106.  Hence, not every claim rises to the level of a constitutional violation.  **"An unwitting failure to provide adequate medical care, a negligent diagnosis or treatment, or even medical malpractice, does not support a valid claim under the Eighth Amendment."** <u>Coletta v. Board of Freeholders of Ocean County</u>, 2007 U.S. Dist. LEXIS 2717 (3d Cir. 2007) (citing Estelle, supra, 429 U.S. at 106) (emphasis added).

The first element of the <u>Estelle</u> test requires an inmate to show that prison officials acted with **deliberate indifference** towards his **serious medical** need. "**Deliberate indifference**" exists "where [a] prison official: (1) knows of a prisoner's need for **medical** treatment but intentionally refuses to provide it; (2) delays necessary **medical** treatment based on a non-

**medical** reason; or (3) prevents a prisoner from receiving needed or recommended **medical** treatment." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

An examination of the record in this matter establishes that the Plaintiff has failed to produce sufficient evidence to support a jury verdict as to both the objective and subjective prongs of deliberate indifference.

Plaintiff's claims must be dismissed because there is no showing that the defendants violated his Eighth Amendment rights. The Eighth amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle, 429 U.S. 97 (1976); Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. Estelle, 429 U.S. at 106; Natale v. Camden County Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. See Natale, 318 F.3d at 582 (finding deliberate indifference  requires proof that the official knew of and disregarded an excessive risk to inmate health or safety). Deliberate indifference is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S. Ct. 1970, 128 l. Ed. 2d 811 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F. Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984). similarly, "mere disagreements over medical judgment do not state eighth amendment

claims." <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an eighth amendment violation. <u>Estelle</u>, 429 U.S. at 105-06; <u>White</u>, 897 F.2d at 110.

Initially, it must be concluded from a review of the Plaintiff's Amended Complaint, that he does not, in the final analysis allege that the defendants *denied* medical care and treatment to him for his ulcerative colitis.  The Plaintiff alleges, rather, that the treatment provided was inappropriate of inadequate, or that the Plaintiff in one way or another, disagrees with the choice of treatment provided.  (See SUF, at ¶¶24-59)  This constitutes an inadequate basis, as a matter of law, upon which to support a claim of deliberate indifference.

Between July 10, 2008, when the Plaintiff was received into the New Jersey Department of Corrections at CRAF  (the Central Reception and Assignment Facility), through his transfer to South Woods State Prison on July 17, 2008, and his transfer to St. Francis Medical Center, on August 6, 2008, the Plaintiff was provided with continuous medical care and treatment:  He received medical treated from a variety of medical staff, including Dr. Martin, who examined, evaluated, assessed, medicated and treated the Plaintiff; continuously received medication for his ulcerative colitis condition, and for other medical needs; was approved for and scheduled for an outside GI Consult; and was ultimately transferred to the inpatient facility, St. Francis Medical Center, when his condition became such that more emergent and intensive treatment was necessitated.

On July 10, 2008, Plaintiff was seen at Nursing Intake by Giselle Williams, LPN, who noted that Plaintiff had been hospitalized two months earlier, and had a history of Hepatitis C and ulcerative colitis.  At that time, Nurse Williams noted that the Plaintiff had been on the medications Asacol and Omeprazole.  (SUF, at ¶25)  Plaintiff was also seen at Physician Intake on July 10, 2008 by Sharon Levin, RN, NP, who noted Plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding.  She also noted Plaintiff's history of IV drug use, and use of cocaine.  The Plaintiff was then placed on the medications:  Sulfasalazine 500 mg, three times per day; and Prilosec 20 mg, daily.  NP Levin also ordered lab testing.  (SUF, at ¶26)

On July 11, 2008, the results of lab testing were received, including results for CBC and Platelets.  (SUF, at ¶27)

On July 15, 2008, the Plaintiff was seen at Sick Call with Phyllis Hewins, RN, with a complaint that his "meds not working for ulcerative colitis," that he has had nausea for three days and not able to eat, but that he "is drinking liquids."  The Plaintiff also reported being in pain, with cramping and a "small amount of loose BM."  At that time the Plaintiff was provided with Acetaminophen 325 mg, for pain, 2 tablets 2-3 times per day as needed, and provided with a supply to self-dispense.  (SUF, at ¶28)

On July 16, 2008, the Plaintiff was seen at Sick call with Grace Melendez, M.D., with a complaint that he "feels lightheaded."  The Plaintiff reported that he has had ulcerative colitis for the past seven  (7)  years, and that he had been hospitalized  eight  (8)  times since September, 2008.  Dr. Melendez noted that Plaintiff's illness was chronic, and that he needed IV hydration, prednisone and a GI consult.  She further noted that the Plaintiff had been accepted for transfer to the infirmary at South Woods State Prison.  (SUF, at ¶29)

On July 17, 2008, the Plaintiff was transferred to South Woods, and seen at a Nurse

Transfer Admission Assessment by Jennifer Kuty, RN, who noted that the Plaintiff stated that he

had no appetite, had been "bleeding rectally for a month," but that he had not vomited blood.  At

that time Nurse Kuty noted Plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal

bleeding; and noted that he was received on the medications: Sulfasalazine 500 mg, three times

per day; Prilosec 20 mg, daily; and Acetaminophen 325 mg, 2 tablets 2-3 times per day.  (SUF,

at ¶30)

On July 17, 2008, Lisa Renee Mills, RN, noted a telephone/verbal order upon admission

to the infirmary, to "push oral fluids," and for administration of IV fluids for dehydration.  (SUF,

at ¶31)  Also on July 17, 2008, Gail Willett, RN, saw Plaintiff in Infirmary Rounds Admission,

and noted that the Plaintiff related that he felt nauseous "on and off," but that he experienced no

vomiting.  Plaintiff also related a seven  (7)  year history of ulcerative colitis, and "intermittent"

rectal bleeding the prior month.  Nurse Willett noted that the Plaintiff presented "pale in color"

and "slightly dehydrated" and that he stated that he had abdominal pain due to his colitis.  Nurse

Willett noted Plaintiff's weight to be 139 pounds, and listed his problems as including: ulcerative

colitis, diabetes mellitus, and a history of rectal bleeding.  Nurse Willett also noted that following

as to efforts to start an IV for administration of fluids:

> Attempted to start IV heplock for fluids ordered but due to
> extensive heroin use of veins - unable to start line after 6 attempts.
> IM given oral fluids and encouraged to drink as much as he can.
> IM states compliance.

SUF, at ¶32).

On July 18, 2008, Plaintiff was seen in Infirmary Rounds by Linda Bigay, RN, who

further noted that she "Attempted to insert Hep-lock but unsuccessful.  IM instructed to drink

copious amounts of fluids today so next nurse oncoming will insert Hep-lock."  At that time, she

also noted Plaintiff's weight to be 139 pounds.  (SUF, at ¶33)  The Plaintiff was also seen on

July 18, 2008 in Infirmary Rounds by James R. Welch, RN, who noted a complaint of diarrhea.

(SUF, at ¶34)

On July 18, 2008, Plaintiff was seen for the first time by Allan Martin, M.D., in Infirmary

Rounds, at which time Dr. Martin examined and evaluated the Plaintiff.  Dr. Martin noted

complaints of diarrhea, abdominal pain, and melena, with a history of ulcerative colitis, and

described Plaintiff as "chronically ill appearing."  Dr. Martin also at that time order medications:

Hydrocodone-Acetaminophen 5-500mg, 2 tablets 4 times per day; and Prednisone 20 mg, 2

tablets daily.  Dr. Martin also discontinued the prior order for Acetaminophen 325 mg.  (SUF, at

¶35)

On July 18, 2008, the Plaintiff was seen in Infirmary Rounds by Clevelyn Ricalde, RN,

who noted at that time that the Plaintiff was alert and oriented x3, with regular respirations, and

that the Plaintiff complained of abdominal pain and diarrhea.  Nurse Ricalde also noted that she

"encouraged more fluid intake," and "continue to monitor."  (SUF, at ¶36)  On

On July 18, 2008, the Plaintiff was also seen in Infirmary Rounds by Stephanie Smith

(Kudla), RN, at which time she noted that the Plaintiff was alert and oriented x3, but that he "did

not want to eat breakfast" due to abdominal pain.  Nurse Kudla noted that she provided the

Plaintiff with a can of Boost  (liquid nutritional supplement), and that there were "no complaints

of diarrhea this shift."  She further noted that the Plaintiff was "encouraged to drink more water"

and that he "verbalizes understanding."  She noted Plaintiff's weight to be 139 pounds.  (SUF, at

¶37)

On July 19, 2008, the Plaintiff was seen in Infirmary Rounds by Christina Gray, RN, who

noted that the Plaintiff was alert and oriented x3, in no distress, but with complaints of symptoms

of weakness and anorexia.  Nurse Gray further noted that "IM admits that he ate breakfast and has been utilizing supplements such as boost for other nutrition," and "will continue to monitor." The Plaintiff's weight was noted at that time to be 139 pounds.  (SUF, at ¶38)

On July 20, 2008, the Plaintiff was seen in Infirmary Rounds by Nurse Welch, who noted complaints of diarrhea with blood, change in bowel habits and abdominal pain, but that there had been "no diarrhea this shift."  The Plaintiff's weight was noted at this time to be 139 pounds. (SUF, at ¶39)  Also on July 20, 2008, the Plaintiff was also seen in Infirmary Rounds by Nurse Kudla, who noted Plaintiff was alert and oriented x3, and that he was weak appearing, with a history of ulcerative colitis and bloody diarrhea, but that there had been "no diarrhea this shift." She further noted that the Plaintiff was "drinking fluids" but that he was "tolerating little foods," and "denied urinary problems."  Plaintiff's weight at that time was noted to be 139 pounds. (SUF, at ¶40)

On July 20, 20080, the Plaintiff was also seen in Infirmary Rounds by Nurse Gray, who noted Plaintiff to be alert and oriented x3, in no apparent distress, but with "continued diarrhea." She noted that the Plaintiff had "no new complaints" and that he was "increasing fluids as instructed."  The Plaintiff's weight was noted at that time to be 139 pounds.  (SUF, at ¶41)

On July 21, 2008, the Plaintiff was seen in Infirmary Rounds by Nurse Bigay, who noted that the Plaintiff "denies any loose stools this tour [shift]" but that he would let her know if there were any.  She further noted that the Plaintiff "states he is feeling better."  (Id.)  The Plaintiff's weight was noted at this time to be 139 pounds.  (SUF, at ¶42)  The Plaintiff was also seen on July 21, 2008, the Plaintiff was also seen in Infirmary Rounds by Nurse Welch, at which time the Plaintiff's weight was noted to be 139 pounds.  (SUF, at ¶43)

On July 21, 2008, the Plaintiff was seen for the second time, by Dr. Martin, in Infirmary Rounds, at which time Dr. Martin examined and evaluated the Plaintiff, and noted complaints of fatigue and malaise, with diarrhea, abdominal pain and melena, but that he denied nausea, vomiting and constipation. Dr. Martin noted that the Plaintiff's complaints of abdominal pain were "mostly in the lower abdomen," and that "the number of stools has decreased since 3 days ago." He noted that the Plaintiff reported that the stools were bloody. Dr. Martin wrote as the Plan for discharge to general population, ordering of lab testing, and ordering of a GI consult. (SUF, at ¶44)

On July 21, 2008, the Plaintiff was discharged to general population, with instructions provided by Nurse Ricalde, who noted that she "instructed inmate to go to med line to get his medications" and to "report to medical for any symptoms." Nurse Ricalde also noted that: "Inmate verbalized understanding of instruction," and that "Inmate stated he feels better now," and that he "left the unit ambulatory in no distress." (SUF, at ¶45)

On July 21, 2008, Dr. Martin completed and submitted a consult referral form for the Plaintiff for a GI Consult. Dr. Martin noted in the referral request:

> Reason: I/M has h/o (history of) ulcerative colitis, that has been refractory to several medical treatments. He states that he has been on asacol, remicade, and prednisone at various times w/o success. He has cont[inued] to have abd[ominal] pain and rectal bleeding. Pls evaluate."

On July 22, 2008, Yasser Soliman, M.D., the Associate Statewide Medical Director for CMS, signed off on the request; and on July 23, 2008, Carmen Gaebler, RN, the Utilization Management Nurse approved the request, and noted that "Criteria met by the utilization management nurse." Within two (2) days of Dr. Martin's submission of the consult request, the GI Consult had been approved, and was scheduled to take place on August 13, 2008, at NJSP (New Jersey State Prison). (SUF, at ¶46)

14

On July 22, 2008, Dr. Martin wrote to change the order for Hydrocodone-Acetaminophen 5-500 mg, from 2 tablets four times per day, to 2 tablets three times per day.  (SUF, at ¶47)

On July 23, 2008, Nurse Levin the receipt of the Discharge Report form Bergen County Regional Medical Center, dated May 8, 2008, which had been requested by personnel at CRAF on July 10, 2008.  (SUF, at ¶48)

On July 25, 2008, the Plaintiff was seen at Sick Call by Mary Ellen Green, RN, who noted Plaintiff's complaints of nausea and hematochezia, but that he denied any vomiting, diarrhea, constipation, change in bowel habits, abdominal pain or melena, at that time.  She also noted complaints of rectal bleeding, bloody stools and poor appetite and weakness."  She further noted that she notified Nurse Fran Green of Plaintiff status, and noted that Nurse Fran Green has "spoke[n] with him re: plan of care," and told Plaintiff that there was a GI Consult pending, and that lab testing has been ordered "for Monday."  Nurse Mary Ellen Green further noted that the Plaintiff was "aware of need for fluids and rest" and that lab testing was to be done."  She also noted that at that time the Plaintiff's current medications included:  Sulfasalazine 500 mg, 1 tablet 3 times per day; Prilosec 20 mg, 1 tablet daily; Prednisone 20 mg, 2 tablets daily; Twocal HN Liquid  (Nutritional supplement), 1 can 3 times per day; and Hydrocodone-Acetaminophen 5-500 mg, 2 tablets 3 times per day.  (SUF, at ¶49)

On July 30, 2008, Jackyline Carrero, HST II  (Health Services Technician), noted that lab testing, including a CMP  (comprehensive metabolic panel), CBS and Platelets, had been ordered by Dr. Martin, and drawn.  (SUF, at ¶50)

On August 1, 2008, in the morning, Nurse Fran Green saw Plaintiff at Sick Call and noted complaints of nausea, abdominal pain, melena, hematochezia, loss of appetite and weight loss - and that Plaintiff denied any vomiting or diarrhea at that time.  Nurse Fran Green also

noted as the Plan: "Admit to infirmary for IVF and steroid therapy," and noted that lab testing

had been ordered/obtained on 7/30/08, and that a GI Consult was pending. She noted a weight

for Plaintiff at that time of 133 pounds. Plaintiff was transferred to the Infirmary on Nurse Fran

Green's order at that time. (SUF, at ¶51)

On August 1, 2008, the result of lab testing ordered and drawn on July 30, 2008, were

reviewed and charted by Dr. Martin. (SUF, at ¶52)

On August 1, 2008, in the afternoon, the Plaintiff was seen in Infirmary Rounds by Dr.

Martin, with complaints of anorexia and weight loss, abdominal pain, and hematochezia. Dr.

Martin noted that the Plaintiff was "chronically ill appearing" and that he was in bed, but in no

apparent distress (NAD). At that time Dr. Martin noted as the Plan: that the GI Consult was

pending (scheduled for August 13, 2008), to continue "supportive care," and to discharge to

general population. (SUF, at ¶53)

On August 4, 2008, the Plaintiff submitted a Health Services Request Form, in which he

stated that he wanted to check on the results of lab testing, and stated: "I lost 27 lbs. and can no

longer walk or control my bowel movement." Plaintiff further stated he requested that he "get

antibiotics, steroids and fluids intravenously to control my colitis problem." The form notes:

"Triaged 8/4/08." (SUF, at ¶54)

On August 5, 2008, results for a stool occult blood test, which had been ordered and

obtained on August 1, 2008, were received and charted by Avynne Hester, PA-C. The stool

occult blood test result was "Negative." (SUF, at ¶55)

On August 5, 2008, the Plaintiff was seen in Sick Call by Nurse Mary Ellen Green,

consequent to his 8/4/08 request form. At that time Nurse Mary Ellen Green noted complaints of

anorexia, fatigue, malaise and weight loss, and that the Plaintiff denied vomiting, constipation,

and melena.  She noted that "he persists in having loose bloody stools and is up most nites in BR

and not able to sleep."  Nurse Green also noted at that time that: "Color sallow and face drawn in

appearance with dark circles and sunken eyes," and that his weight at that time was 130 pounds.

Nurse Green also provided the Plaintiff at that time with a wheelchair, and wrote that he needed

a lower floor and bunk due to his "present weakness and malaise."  (SUF, at ¶56)

Nurse Mary Ellen Green noted that as of August 5, 2008, the Plaintiff's current

medications included: Sulfasalazine 500 mg, 1 tablet 3 times per day; Prilosec 20 mg, 1 tablet

daily; Prednisone 20 mg, 2 tablets daily; Twocal HN Liquid  (Nutritional supplement), 1 can 3

times per day; and Hydrocodone-Acetaminophen 5-500 mg, 2 tablets 3 times per day.  Nurse

Fran Green, at this time, also ordered an :increase fluid intake," and "bottom floor, bottom bunk,

and w/c  (wheelchair)" for the Plaintiff.  (SUF, at ¶57)

On August 6, 2008, in the morning, the Plaintiff was seen by Nurse Fran Green, in an

Office Visit - Follow Up, at which time she examined and evaluated him.  At that time, Nurse

Green noted that the Plaintiff's weight was 132 pounds, BP was 110/80, and pulse 100.  At that

time, Plaintiff complained of anorexia, fatigue, malaise and weight loss; and appeared "thin,

malnourished" with "generalized weakness."  Plaintiff also complained of nausea, diarrhea,

abdominal pain, and blood in his stool; and denied vomiting.  (SUF, at ¶58)

On August 6, 2008, following her examination and evaluation of the Plaintiff in the

follow up office visit, Nurse Fran Green contacted Dr. Martin, and reviewed her evaluation and

assessment with him.  At that time, Dr. Martin agreed with her assessment, and Nurse Green

noted: "Reviewed with Dr. Martin; send to SFMC  (St. Francis Medical Center) via state van for

followup tx  (treatment)."  Nurse Green then charted the order for Plaintiff to be sent to St.

Francis Medical Center ER "via State Van for medical evaluation & tx."  (SUF, at ¶59)

17

As a matter of law, the Plaintiff's claims of deliberate indifference under 42 U.S.C. §1983 must fail.  With respect to the subjective component of deliberate indifference, the record is devoid of any evidence to support the conclusion that Dr. Martin had subjective knowledge that his actions in treating the Plaintiff's ulcerative colitis condition was likely to cause serious harm to the Plaintiff, and disregarded such a likelihood.  There is no evidence that the actions of Dr. Martin in treating the Plaintiff, in fact, caused any such harm to the Plaintiff, let alone that Dr. Martin, in acting to provide Plaintiff with medical care and treatment, had the requisite subjective knowledge.

With respect to the objective component of deliberate indifference, the Plaintiff has predicated his claims upon the contention that he was **denied** medical care, and/or that such medical care was delayed such that the treatment constituted deliberate indifference.  It is clear, however, as an objective reality, that the Plaintiff was neither denied medical care by Dr. Martin, nor by any of the other various medical providers which tended to him during the time period at issue in this matter.

Further, as discussed in more detail in Part III, below, there is no evidence that the Plaintiff was denied a referral to an outside GI Consult.  To the contrary, the only evidence is that Dr. Martin did, in fact, submit a referral request for just such a GI Consult within a few days of the Plaintiff's transfer to South Woods, that the request was quickly approved, and that the Plaintiff was scheduled for an outside GI Consult that was to take place at New Jersey State Prison on August 13, 2008.

The record demonstrates, as summarized above, that the Plaintiff received ongoing medical care for his ulcerative colitis, including examination and assessment, testing, the provision of medication, and the referral for a GI Consult for further evaluation and treatment to

occur on August 13, 2008  (which consult was obviated by the need, on August 6, 2008, for a more emergent response to the Plaintiff's developing medical condition).

      As a matter of law, the Plaintiff has failed to demonstrate that the defendants acted with deliberate indifference to the Plaintiff's ulcerative colitis, and his claims pursuant to 42 U.S.C. §1983 should therefore be dismissed with prejudice.

II.   **THE EXISTENCE OF ANY DISAGREEMENT AS TO THE COURSE OF THE MEDICAL TREATMENT PROVIDED TO THE PLAINTIFF FAILS AS A MATTER OF LAW TO ESTABLISH A CLAIM FOR DELIBERATE INDIFFERENCE UNDER 42 U.S.C. §1983.  ACCORDINGLY, THE PLAINTIFFS CLAIMS SHOULD BE DISMISSED WITH PREJUDICE**

At best, the Plaintiff may be able to demonstrated the existence of a disagreement as to the course of his medical treatment.  Such a disagreement as to the course or selection of medical treatment, never suffices to establish a claim of deliberate indifference under 42 U.S.C. §1983.  As a matter of law, such a disagreement as to the course of a patient's medical treatment does not support a claim under §1983.

The Supreme Court of the United States had expressly held that negligent conduct never supports a cause of action based on 42 U.S.C. §1983.  Daniels v. Williams, 474 U.S. 327 (1986).  Complaints as to the quality or appropriateness of the medical care never support a claim of an Eighth Amendment violation.  Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) cert. den., 486 U.S. 106 (1988).  In Holly v. Rapone, 476 F.Supp. 226 (E.D. Pa. 1979), Senior Judge Davis held:

> Denying plaintiff's Eighth Amendment claim I remain consistent with the ruling '[W]here the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim'.  Roach v. Kligman, 412 F.Supp. 421, 525 (E.D. Pa. 1976). Quoting approvingly in Norris v. Frame, supra, 585 F.2d at 1185.

Id. at 231.

The United States District Court for the Middle District of Pennsylvania in Farmer v. Carlson, 685 F.Supp. 1335 (M.D. Pa. 1988), held that questions regarding the timeliness of the treatment or the provision of medication were based on negligence or malpractice and must be dismissed:

> Thus, 'the key question...is whether defendants have provided
> plaintiff with some type of treatment regardless of whether it is
> what the plaintiff desires'.  (Citations omitted).

Id. at 1339.  *See, also* Smith v. Marcantonio, 910 F.2d 500 (8th Cir. 1990) (mere disagreement as

to course of medical care fails to state claim of deliberate indifference).

The majority of federal courts to consider the issue have concluded that as long as prison

authorities provide some treatment to an inmate, even if that treatment constitutes inappropriate

care, the required subjective knowledge fails to exist to impose liability upon the healthcare

professionals involved.  In Rodriguez v. Joyce, 693 F.Supp. 1250 (D.Me. 1988), the court

granted a motion for summary judgment in a case in which the plaintiff, a prisoner, alleged that

he injured his finger while playing volleyball.  When he sought medical treatment from

employees of the prison, where he served as an inmate, he received aspirin for the pain.  The

medical personnel at the prison never took an x-ray.  The plaintiff contended that he had

fractured his finger.  He maintained that the failure of the medical personnel at the prison to take

the x-ray resulted in his receiving inadequate medical care.  The court, in granting the motion for

summary judgment, stated:

> But, as the Supreme Court clearly stated in Estelle, merely
> questioning the form of medical treatment does not constitute a
> cognizable section 1983 claim.  Plaintiff has alleged nothing more
> than negligent diagnosis.  A decision whether or not to order an x-
> ray 'is a classic example of a matter for medical judgment.  A
> medical decision not to order an x-ray, or like measure, does not
> represent cruel and unusual punishment.'  Estelle, (citation
> omitted.)  This is quite apt in the context here, where the claim
> involves only a mere injury to a finger joint.  The failure of the
> nurses to order an x-ray of plaintiff's injured finger is not cruel and
> unusual punishment.  Our holding here is consonant with the
> approach towards preventing section 1983 from becoming a
> national state tort claims act administered in the federal courts.
> Quoting Estate of Bailey v. County of York, 768 F.2d 503, 513 (3d
> Cir. 1985) (Adams, J., dissenting).

Id. at 693 F.Supp. at 1253.

Even differing medical opinions among prison doctors does not support a claim of cruel and unusual punishment based on deliberate indifference to a serious medical need.  Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) cert. den., 450 U.S. 1041 (1981).  Evidence of disagreements between outside doctors and prison doctors fails to demonstrate deliberate indifference to a serious medical need.  Sanders v. Vigil, 917 F.2d 28, 1990 W.L. 160964 *2 (9th Cir. 1990).  *Accord*, Cruz v. Ward, 558 F.2d 658, 662 (2nd Cir. 1977) (it is to be expected that prison physicians should sometimes disagree with the opinions of the hospital staff) cert. den., 434 U.S. 1018 (1978).  In Gardner v. Zaunbrecher, No. 95-CV-1543, 1996 W.L. 507072 *2 (N.D. N.Y. Sept. 4, 1996) the Court held that a disagreement among an inmate's physicians over a proper course of treatment did not show conscious or callous indifference to a serious medical need.

Even though a disagreement fails as a matter of law to sustain a claim for deliberate indifference under 42 U.S.C. §1983, the surgeon who treated the Plaintiff commencing in August, 2008, at St. Francis Medical Center, and who performed the Plaintiff's two surgeries, felt that the Plaintiff "was being treated appropriately" at South Woods, prior to coming to St. Francis.  (SUF, at ¶129-130)  Further, Dr. Shrager testified that the surgical treatment which the Plaintiff underwent follow his transfer to St. Francis in August, 2008, that the "preferred approach" to the remediation of the Plaintiff's ulcerative colitis condition was "the surgical one," and that for patients that met the Plaintiff's criteria, "when possible, surgery is the preferred approach."  (SUF, at ¶145)  Dr. Shrager testified that because of the Plaintiff's long history of ulcerative colitis, multiple flare-ups and hospitalizations, medical management was not a successful course of treatment, but that surgery was preferable.  (SUF, at ¶¶144-145)  Further, Dr. Madanmohan R. Patel, who treated the Plaintiff at Bergen Regional Medical Center, prior to

his coming to CRAF, likewise testified that because of the Plaintiff's frequent need for

hospitalization due to ulcerative colitis flare-ups  -  including eight hospitalizations in the ten

months prior to the time when Dr. Patel first saw the Plaintiff  -  demonstrated that the medical

management of Plaintiff's condition was not a successful approach.  (SUF, at ¶124)

 Both Dr. Patel and Dr. Shrager appeared to concur on two other points:  First, neither

would have been surprised to learn that between 25 and 40% of ulcerative colitis patients had the

surgeries that the Plaintiff had.  (SUF, at ¶¶123, 143)  Second, the only cure for ulcerative colitis

is by the surgery which Plaintiff received.  (SUF, at ¶¶122, 145)  As Dr. Shrager testified:

> Ulcerative colitis is a curable disease.  It's restricted to the rectum
> and the colon, and in young patients, in general, once they're
> optimized, **the preferred approach is the surgical one**, resecting
> the entire colon and rectum.  It really is the preferred approach,
> preferred to a lifetime of immunosuppressants and steroids, et
> cetera.  (SUF, at ¶145)

 Further, two experts engaged by the defendants in the review of this matter, have

concluded that the medical care and treatment provided to the Plaintiff by defendants at CRAF

and South Woods, was appropriate:  Nathaniel R. Evans II, M.D., is board certified in emergency

medicine, certified by the National Commission on Correctional Health Care as a correctional

health care provider, and has extensive experience in the provision of correctional healthcare

(See Report of Dr. Evans, and Supplemental Report of Dr. Evans, attached hereto as Exs. "L"

and "M"); and Larry M. Borowsky, M.D., board certified in gastroenterology and internal

medicine  (See Report of Dr. Borowsky, attached hereto as Ex. "K").  Dr. Evans opined that the

care provided to the Plaintiff at South Woods was "medically appropriate and within the standard

of care"  (Ex. "L", at 6), and that the management of the Plaintiff's condition was "within the

standard of care for a correctional facility."  (Ex. "M", at 2)  Dr. Borowsky opined that the

Plaintiff received "appropriate treatment" at South Woods, and that the care provided was "within all accepted standards of care." (Ex. "K", at 7)

To the extent that the Plaintiff has attempted to support his claims against moving defendants by demonstrating the existence of a disagreement as to the course of the Plaintiff's treatment  -  be that disagreement be with the Plaintiff himself, or any other treating professional -  **such a disagreement fails, as a matter of law, to constitute a cognizable claim under 42 U.S.C. §1983**.  In this case, there can be no dispute, based upon the undisputed evidence of record, but that the Plaintiff, throughout his weeklong stay at CRAF, and the twenty  (20) days he spent at South Woods prior to his initial admission to St. Francis Medical Center, received daily medical care and treatment from Dr. Martin and/or a variety of medical personnel.   Even in the face of the Plaintiff's own allegations as set forth in the Amended Complaint, he cannot claim that he failed to receive treatment.

Further, both Dr. Patel and Dr. Shrager pose no criticism of the care rendered at South Woods in their deposition testimony, and the two experts presented by the defense likewise find the care provided to be within the applicable standards of care.  Nevertheless, and even in the face of disagreement with these conclusions, such disagreement fails to establish a claim of deliberate indifference.  The evidence in the matter demonstrates that the Plaintiff received substantial medical care and treatment  -  including medication, nutritional supplementation, examination and evaluations regularly throughout the relevant time period, by Dr. Martin and numerous other medical staff at CRAF and then at South Woods.  At best, this evidences a disagreement with the course and nature of the Plaintiff's treatment.  Such disagreements as to the course and choice of medical care and treatment provided to in inmate, fails as a matter of law to support a claim of deliberate indifference under 42 U.S.C. §1983.

Accordingly, the Plaintiff's claims against moving defendants, should therefore be dismissed with prejudice.

**III.    THE PLAINTIFF HAS FAILED TO DEMONSTRATE THE EXISTENCE OF A CUSTOM OR POLICY ON THE PART OF MOVING DEFENDANTS, CORIZON, INC., F/K/A CORRECTIONAL MEDICAL SERVICES, INC., LIONEL ANICETTE, M.D., YASSER SOLIMAN, M.D. AND DAVID MEEKER, WHICH RESULTED IN THE ALLEGED DELIBERATE INDIFFERENCE TO PLAINTIFF'S SERIOUS MEDICAL NEEDS.  THEREFORE, PLAINTIFFS' <u>CLAIMS AGAINST THEM SHOULD BE DISMISSED WITH PREJUDICE</u>**

Plaintiff's Amended Complaint must be dismissed because Plaintiff has failed to prove that any alleged constitutional deprivation resulted from the customs or policies of moving defendant, CMS, or any of its alleged policymakers, moving defendants, Anicette, Soliman and Meeker.  The Plaintiff has failed to demonstrate that CMS had in place a policy or custom that violated Plaintiff's constitutional rights, or that a CMS policymaker was deliberately indifferent to his medical needs.

To sustain a § 1983 claim as against CMS, a plaintiff must show that it had in place a custom or policy which resulted in a constitutional deprivation, or conduct by a policy maker which constitutes deliberate indifference.  <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658, 691-92 (1978).  *See also,* <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 583-84 (3d Cir. 2003) (§1983 claim against an entity, a plaintiff must demonstrate that the entity had a policy or custom in place which triggered a constitutional violation).  A policy is established only when a decision maker with final authority issues an edict or policy. <u>Id.</u> at 584.  A custom is established when an act, although not formally approved by a policymaker, is so widespread so as to have the force of a policy. <u>Id.</u>  Absent this showing of a prohibitive policy or custom, an entity cannot be held liable for a 42 U.S.C. § 1983 violation merely because it employs a wrongdoer. <u>Id.</u>

In order for an entity such as CMS to be held liable on a §1983 claim, however, the Plaintiff "must provide evidence that there was a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." Natale, 318 F.3d at 584 citing Board of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997)

In Natale, the Third Circuit summarized the requirements for "custom" and "policy" as follows:

> A policy is made "when a decision-maker possess[ing] final authority to establish . . . policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 . . . (1986) (plurality opinion). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bryan County, 520 U.S. at 404.

318 F.3d at 584.

Liability however is not established merely from the existence of an official policy or custom; in order to create liability, the official policy or custom must be the legal cause of the constitutional deprivation. City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). Only a practice that has become so permanent or well-settled that it has acquired the status of law can constitutes a custom that may impose liability. City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). Further, a single incident of unconstitutional conduct by a governmental employee or official who does not have policymaking authority is not sufficient to establish the existence of an official policy or custom. See City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985).

In the case at bar, Plaintiff has failed to demonstrate the existence of any CMS policy resulting in the alleged deprivation of Plaintiff's constitutional rights. Also, the Plaintiff has failed to adduce any evidence that the level of medical care he received was the result of any alleged widespread custom or course of action by CMS personnel. Id. Rather, the evidence

27

shows that the Plaintiff received constant and continuous medical care and treatment throughout the time period at issue.  There is no evidence whatsoever that the Plaintiff was ever denied medical care.  The medical records and testimony demonstrate that the Plaintiff received medical care and treatment throughout his incarceration within the NJ-DOC, at CRAF and SWSP, and throughout the time leading up to his initial hospitalization, during which he experienced his initial surgery.

The most specific allegation of a custom or policy  -  other than generalized assertions that the defendants had a custom or policy to deny medical care to inmates  -  is the allegation that the defendants had a policy of "denying or delaying referrals … based on non-medical factors.  (Ex. "B", at ¶78)  That this "policy" was one of "denying and delaying expensive referrals and treatments in favor of less expensive and ineffective measures including, but not limited to, ignoring the serious medical needs of inmates."  (Ex. "B", at ¶87)

Dr. Anicette testified as to the referral submission and approval process, and testified that it was "very uncommon" for a referral to be denied, and that the cost of treatment was never a consideration in the determination of whether to provide any particular care.  (See SUF, at ¶¶152-154)  Dr. Soliman further testified as to the referral process, and testified that the majority of referrals requests submitted "met criteria" and were approved.  (See SUF, at ¶¶168-170)

The Plaintiff has adduced no evidence to support the allegation that the Plaintiff was subjected to a policy of denying or delaying any referral for any reason, let alone for financial reasons; the Plaintiff can only assert that such a policy exists.  The evidence, however, is clearly to the contrary.  The sole referral at issue with regard to the Plaintiff's treatment during the time period at issue, is the referral of Plaintiff for a GI consult.  The evidence is clearly that within days of the Plaintiff's arrival at South Woods, and coming under the care of Dr. Martin, the

referral request was submitted by Dr. Martin, reviewed and processed, and then both **approved** and **scheduled**.

On July 17, 2008, the Plaintiff was transferred from CRAF to South Woods, and seen by nursing staff for intake and assessment.  (SUF, at ¶30)  The following day, July 18, 2008, the Plaintiff was first seen by Dr. Martin, who examined him and evaluated his condition, and wrote medication orders.  (SUF, at ¶35)  On July 21, 2008, the Plaintiff was seen for the second time by Dr. Martin in infirmary rounds, at which time Dr. Martin again examined and evaluated him, ordered laboratory testing, and wrote and submitted a GI Consult referral request.  (SUF, at ¶44) The GI Consult referral request submitted by Dr. Martin on July 21, 2008, stated:

> Reason:  I/M has h/o  (history of)  ulcerative colitis, that has been refractory to several medical treatments.  He states that he has been on asacol, remicade, and prednisone at various times w/o success. He has cont[inued] to have abd[ominal] pain and rectal bleeding. Pls evaluate."

(SUF, at ¶46; Ex. Q-1)  The following day, July 22, 2008, Dr. Soliman signed off on the request; and on July 23, 2008, Carmen Gaebler, RN, the Utilization Management Nurse approved the request, and noted that "Criteria met by the utilization management nurse."  (SUF, at ¶46) Accordingly, within four days of the Plaintiff's transfer to South Woods, and three days of coming under the care of Dr. Martin, a GI Consult referral had been submitted by Dr. Martin, and within two  (2)  days of Dr. Martin's submission of the consult request, the GI Consult had been approved, and was scheduled to take place on August 13, 2008, at NJSP  (New Jersey State Prison).  (SUF, at 46)  Plaintiff, however, on August 6, 2008, one week prior to the date scheduled for the GI Consult, August 13, 2008, was transferred to St. Francis Medical Center for more emergent care.

It is beyond dispute that within a few days of coming to South Woods and coming under the care of Dr. Martin, a GI Consult referral for the Plaintiff had been requested, reviewed,

approved and scheduled to take place in the ordinary course.  The date scheduled, following the approval of the request on July 23, 2008, was August 13, 2008.  (SUF, at 46; Ex. Q-1)  There is no evidence that Dr. Martin played any role in the date upon which the GI Consult was scheduled, of that he had the ability to have affected the date scheduled.  The GI Consult for the Plaintiff had in fact been ordered by Dr. Martin, approved and scheduled, and was pending for August 13, 2008, when the circumstances presented to Dr. Martin by Nurse Fran Green on August 6, 2008 warranted more emergent treatment, and the Plaintiff was send, upon Dr. Martin's orders, to St. Francis Medical Center for evaluation.  This, Plaintiff was sent out to St. Francis and evaluated and treated, including in GI Consult with Dr. Shrager  (See SUF, at ¶128), prior to the pending date for the outpatient GI Consult, which was to have taken place at New Jersey State Prison on August 13, 2008.

The sole policy specifically set forth by the Plaintiff is one of denying or delaying referrals for non-medical reasons.  In this case, the evidence is clear:  The Plaintiff was not denied a referral for any reason, in fact, the referral request at issue, submitted by Dr. Martin for a GI Consult with a few days of the Plaintiff coming under his care, was **approved** and was scheduled to take place during the ordinary course of business.  There is no evidence that the date upon which the Plaintiff's GI Consult was scheduled was either under the control of Dr. Martin or any of the defendants, nor that any policy existed the purpose of which was to delay any such referral, for financial  (as Plaintiff alleges)  or any other reason.

The Plaintiff's § 1983 claims against CMS, Drs. Anicette and Soliman, and Mr. Meeker, must be dismissed with prejudice, as he has failed to demonstrate the creation and implementation any policy or custom on their part which has been shown to have resulted in the

constitutional deprivations alleged by the Plaintiff, i.e.., the alleged the deliberate indifference to

Plaintiff's medical needs.

IV. **TO THE EXTENT THAT THE PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM RELIES UPON ALLEGATIONS OF *RESPONDEAT SUPERIOR* LIABILITY, NO SUCH CLAIM EXISTS UNDER 42 U.S.C. §1983, AND PLAINTIFF'S CLAIMS AS AGAINST CMS, ANICETTE, SOLIMAN AND <u>MEEKER, SHOULD THEREFORE BE DISMISSED WITH PREJUDICE</u>**

To the extent that the Plaintiff is attempting to prove a claim under 42 U.S.C. §1983 as against Moving Defendants based upon the doctrine of *respondeat superior* liability, his claims must be dismissed. Claims brought pursuant to 42 U.S.C. § 1983 cannot be predicated upon a theory of vicarious or *respondeat superior* liability. Supervisory liability under 42 U.S.C. § 1983 cannot be predicated solely upon a theory of *respondeat superior*. <u>Polk County v. Dodson</u>, 454 U.S. 312, 325 (1981).

> A defendant in a civil rights action must have personal involvement in the alleged wrong: liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or actual knowledge and acquiescence. Allegations of participation are actual knowledge and acquiescence, however, must be made with appropriate particularity.

<u>Rode v. Dellarciprete,</u> 845 F.2d 1195, 1207 (3d Cir. 1988)(internal citations omitted).

It is well-settled that a corporate entity such as CMS, cannot be held responsible for the actions of its employees under a theory of *respondeat superior* or vicarious liability. <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 691 (1978); <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 583-84 (3d Cir. 2003) The Third Circuit has specifically rejected *respondeat superior* liability pursuant to 42 U.S.C. §1983. It has recognized no exceptions. The Third Circuit has repeatedly concluded that no *respondeat superior* liability exists under any circumstance pursuant to 42 U.S.C. §1983. See <u>Rode v. Dellarciprete</u>, 845 F.2d 1195 (3d Cir. 1988); <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1285 (3d Cir. 1997); <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

Personal involvement on the part of an individual defendant in the allege constitutional deprivation is essential to a claim under §1983. Rode, 845 F.2d at 1207. Personal involvement "can be shown through allegations of personal direction or of actual knowledge and acquiescence." Id. Allegations of personal participation, or actual knowledge or acquiescence, however "must be made with appropriate particularity." Id.

A plaintiff must show that the supervisor "participated in violating [the plaintiff's] rights, or that he directed others to violate them, or that he, as the person in charge . . . had knowledge of and acquiesced in his subordinates ' violations.'" Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995). Mere responsibility for supervising other defendants is not dispositive of liability. Rode v. Dellarciprete, supra, 845 F.2d at 1208.

"Actual knowledge and acquiescence" amount to supervisory liability because together they "can be equated with 'personal direction.'''" Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997). Furthermore, while knowledge can be inferred from the circumstances, Baker, supra, 50 F.3d at 1194 it nevertheless must be actual knowledge rather than constructive knowledge. Id. at 1201 n.6 (Alito, C.J. concurring and dissenting). In fact, "actual knowledge" may also require the superior's knowledge that the subordinate officers lacked a lawful basis for their actions. Id.

Most specifically, to the extent that the Plaintiff attempts to assert claims based in respondeat superior liability, and to hold Moving Defendants, Lionel Anicette, M.D., Yasser Soliman, M.D., and David Meeker, liable under the doctrine for the alleged conduct of Dr. Martin, such claims must be dismissed.

Plaintiff, in his Amended Complaint, alleges that each of these defendants were officials of CMS, and not personally involved in the provision of care to the Plaintiff. Plaintiff alleges

that David Meeker, at the relevant time, was the CMS Vice President of Operations for the State of New Jersey (Ex. "B", at ¶10); that Dr. Anicette was the CMS State Medical Director for the State of New Jersey (Ex. "B", at ¶12); and that Dr. Soliman was the Associate State Medical Director for the State of New Jersey (Ex. "B", at ¶13). See also SUF, at ¶¶146, 150, 162; and, generally, the testimony of Dr. Anicette (Ex. "G"), and Dr. Soliman (Ex. "H"). Further, when asked at his deposition if he even knew who Dr. Soliman or Dr. Anicette were, the Plaintiff responded "No." (Ex. "D", at 235) He also testified that he saw no other physician's at South Woods for treatment during the relevant time period other than Dr. Martin. (Ex. "D", at 235-236) With respect to David Meeker, Dr. Anicette testified that he was an administrator for CMS, and "chief executive for the contract for CMS", but that he was not a physician. (Ex. "G", at 36-37) As such, it is clear that Mr. Meeker was not involved in providing medical care to the Plaintiff.

A review of the extensive medical records documenting the Plaintiff's medical care and treatment (See Ex. "P", Plaintiff's inmate EMR, electronic medical records; and Ex. "S", Plaintiff's inmate "Hard Chart". See also SUF, at ¶¶24-59) demonstrates the complete absence of any individual involvement by or care provided by Mr. Meeker, Dr. Anicette and Dr. Soliman.

The evidence of record, the testimony, the documentation, the medical records, viewed as a whole, demonstrates a complete lack of evidence of any personal involvement in the medical care and treatment of the Plaintiff by defendants, Dr. Anicette, Dr. Soliman or David Meeker.

Accordingly, and to the extent that the Plaintiff's Amended Complaint seeks to impose liability based upon the doctrine of *respondeat superior*, such claims as against defendants CMS, Anicette, Soliman and Meeker must, as a matter of law fail, and should therefore be dismissed with prejudice.

**V.    THE PLAINTIFF FAILED TO EXHAUST THE AVAILABLE ADMINISTRATIVE REMEDIES, PURSUANT TO THE PRISON LITIGATION REFORM ACT, 42 U.S.C. §1997E(A), WITH REGARD TO HIS CLAIMS AGAINST MOVING DEFENDANTS, AND HIS CLAIMS THEREFORE <u>SHOULD BE DISMISSED WITH PREJUDICE</u>**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides in pertinent part:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility **until such administrative remedies as are available are exhausted.** 42 U.S.C. § 1997e(a). [emphasis added]

The inmate must exhaust all administrative remedies available to him, even if the inmate feels those remedies will be ineffective, or said process cannot grant the desired remedy. <u>Booth v. Churner</u>, 532 U.S. 731, 739-41 (2001); <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). The exhaustion of all administrative remedies, *at all levels of review*, is mandatory, even if (1) the prisoner believes that are ineffective, or (2) the available administrative process cannot grant the desired remedy. <u>Booth</u>, 532 U.S. at 739-31; <u>Porter</u>, 534 U.S. at 524; <u>Bailey-El v. Fed. Bur. Of Prisons</u>, 246 Fed.Appx. 105, 107 (3d Cir. 2007); <u>Jackson v. Ivers</u>, 244 Fed.Appx. 508, 512 (3d Cir. 2007). Therefore, to comply with the PLRA, a prisoner must properly exhaust administrative remedies as a precondition to bringing a federal claim in federal court, or risk defaulting the claim. <u>Warren v. Pennsylvania</u>, 316 Fed.Appx. 109, 112 (3d Cir. 2008).

The PLRA's exhaustion requirement applies to all inmates regardless of the seriousness of the inmate's underlying claim. <u>Porter</u>, 534 U.S. at 532. To determine if a prisoner has exhausted all administrative remedies, the Court must evaluate a prisoner's compliance with the prison's administrative regulations governing inmate grievances. <u>Spruill v. Gillis</u>, 372 F.3d at 218, 222 (3d. Cir. 2004). The exhaustion requirement encompasses the idea that the prisoner is responsible for bringing a grievance to the attention of the appropriate prison official so that the

facility has a chance to respond to the grievance before resorting to the court system.  Id. at 227.

After filing the initial grievance, the inmate is required to carry a grievance process through any

available appeals before seeking relief from a Federal Court.  Nyhuis v. Reno, 204 F.3d 65, 67

(3d Cir. 2000).  If an inmate has not pursued a grievance through each level of appeal available

within the prison system, he will not be considered to have exhausted all administrative

remedies.  Spruill, 372 F.3d at 232.  Compliance with the prison's administrative remedy scheme

must be substantial in order to meet the requirements of the PLRA.  Nyhuis, 204 F.3d at 77-78.

When an inmate handbook sets forth a grievance procedure, a prisoner is required to avail

himself of those administrative remedies afforded him therein in order to satisfy the mandatory

exhaustion requirement of the PLRA.  Concepcion v. Morton, 306 F.3d 1347, 1354-55 (3d Cir.

2002) (reversing District Court's decision and directing dismissal of State Court prisoner's

Complaint for failure to exhaust administrative remedies pursuant to §1997(e)(a) despite the fact

that the inmate handbook had not been formally adopted by the New Jersey Department of

Corrections).  The Concepcion Court found that the grievance procedure described in the inmate

handbook constituted an "administrative remedy" for the purposes of §1997(e)(a).  Therefore,

there could be no doubt that New Jersey State Prison's inmate manual constituted the

"administrative remedy" which plaintiff was required to utilize prior to initiating legal action.

The New Jersey Department of Corrections provides inmates within the state prison

system with administrative remedies via the Inmate Remedy System, and articulates that process

through the Inmate Remedy System Policy ("IMM.002.001").  (See copy attached hereto as Ex.

"R")  Pursuant to the NJ-DOC Inmate Remedy Policy, an inmate initiates the process by the

filing of an Inmate Remedy Form, a response to the Remedy Form is provided, and then the

inmate may file an appeal of the response.  (See Ex. "R")

The New Jersey Department of Corrections' Inmate Remedy System  (Ex. "R") provides

the mechanism through which an inmate in a New Jersey state prison may grieve any complaints,

including those pertaining to medical care and treatment:

> The Inmate Remedy System means the comprehensive system
> through which an inmate may initially and formally submit a
> "Routine Inmate Request" and/or an "Interview Request" in order
> to obtain information, and to present issues, concerns, complaints
> in writing to the correctional facility staff.  The *Inmate Remedy
> System* also includes an "Administrative Appeal" through which
> inmates are encouraged to formally appeal to the Administrator or
> designee the decision or fining rendered by correctional facility
> staff in regard to the "Routine Inmate Request" or "Interview
> Request" that was previously presented by the inmate.   This
> comprehensive *Inmate Remedy System* consists of:
>
> 1.  A "Routine Inmate Request";
> 2.  An "Interview Request"; and
> 3.  An "Administrative Appeal."

Ex. "R", Policy No. IMM.002.001, at 2.   The Policy further is further explained as follows:

> The NJ DOC has mandated that inmates are provided a
> departmentally-approved procedure for resolution of complaints,
> concerns, questions, problems and/or grievances that have not been
> resolved on an informal level.  To accomplish this, the NJ DOC
> had implemented a multi-level *Inmate Remedy System*.   This
> process is designed to provide a confidential route for inmates to
> make the administration aware of issues that may exist within the
> correctional facility, and provide a method for positive interaction
> between staff and the inmate population.   This process also
> provides a method for positive interaction between staff and the
> inmate population.   This process also provides correctional facility
> staff,  senior administration and the Office of the Attorney General
> with a specific, written mechanism to track employee responses.
>
> All inmates may utilize the *Inmate Remedy System*.  This process is
> required to help resolve inmate complaints, concerns, questions,
> and/or problems relative to issues or conditions under the
> jurisdiction of the NJ DOC that affect them personally.   This
> process must be used to request a personal interview with
> appropriate staff to resolve their personal complaints, concerns,
> questions, and/or problems relative to issues or conditions within
> the NJ DOC and to request an administrative appeal for the

37

potential resolution of complaints and grievances.  Additionally, the *Inmate Remedy System* provides a record of an incident.

**Inmates are required to utilize the *Inmate Remedy System* before applying to the courts for relief.**

Ex. "R", Policy No. IMM.002.001, at 3.

A review of the Plaintiff inmate medical records files produced in the discovery of this matter  (including the Plaintiff's EMR - electronic medical records, *see* Ex. "P"; and Plaintiff's medical "hard chart," *see* Ex. "S")  demonstrates that the Plaintiff failed to file a single inmate remedy/grievance form, and that therefore he has failed to exhaust the available administrative remedies under the inmate grievance process.  This constitutes a failure to satisfy the requirements of the Prison Litigation Reform Act, 42 U.S.C. §1997e(a).

With respect to any colorable written "complaints" concerning the medical care and treatment he received at South Woods, the sole source - broadly viewed - any such "complaints" lie within the few Health Services Request Forms which the Plaintiff filed, and which are attached hereto as Ex. "Q-5".  The Plaintiff filed a total of three  (4)  Health Services Request Forms  (*See* Ex. "Q-5"), which may be summarized as follows:

(1)  July 12, 2008, in which the request is stated as: "Medication not working - Abdominal pain (ulcerative colitis)."

(2)  August 4, 2008, at which time the Plaintiff stated:

> I want to check on blood test taken last week.  I lost 27 lbs and can no longer walk or control any bowel movement.  I must get antibiotics, steroids and fluids intravenously to control by colitis problem.  Urgent matter.

(3-4)  October 20, 2008 and October 28, 2008, both of which pertain to requests concerning dental treatment.

Two of the four HSRFs pertain to medical care and treatment.  However, even if these Health Service Request Forms could be considered an attempt by the Plaintiff to "grieve" his medical complaints, to otherwise engage in the requirements of the Inmate Remedy System, it is clear that there is no attempt at follow-up by Plaintiff, in either the second or third (administrative appeal) parts of the process.  In order to comply with the requirements of the NJ-DOC's Inmate Remedy System, an inmate must not only commence the, but pursue each of its steps, up to an including the administrative appeal level.  Here, it is clear that the Plaintiff never sought to avail himself of the Inmate Remedy System; he never filed a single grievance, never initiated the required process pursuant to the NJ-DOC's Inmate Remedy System.

Accordingly, the Plaintiff failed to avail himself of the Inmate Remedy System, with respect to any claim presented in this matter as against Moving Defendants.  As such, the Plaintiff failed to exhaust the available administrative remedies as required pursuant to 42 U.S.C. §1997e(a).  The Plaintiff's claims as against the Moving Defendants should therefore be dismissed with prejudice.

**VI.  THE PLAINTIFF HAS FAILED TO ESTABLISH THAT THE ACTIONS OF THE DEFENDANTS VIOLATED PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT AND THEREFORE PLAINTIFF'S CLAIM SHOULD BE DISMISSED WITH PREJUDICE**

The Plaintiff further attempts to assert in this matter a claim that his rights under the First Amendment were violated when the defendants allegedly "retaliated" against him for having voiced his dissatisfaction with the medical care provided to him.  The First Amendment of the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const., Amend. 1.

The Plaintiff in his Amended Complaint, alleges:

> 94.    During Plaintiff's incarceration with NJDOC in July 2008 and thereafter, Defendants were responsible for providing Plaintiff with medical care.  Defendants had a duty not to **withhold medical care from Plaintiff in retaliation for his exercise of free speech**, . . .

> 95.    Plaintiff **expressed his need for medical attention** to address Defendants on numerous occasions; **in retaliation for his entreaties, the CMS Defendants ignored Plaintiff's serious medical needs** and failed to provide the necessary treatment for same, thereby violating Plaintiff's First Amendment right to freedom of expression.

Ex. "B", at ¶¶94-95.  Thus, in an example of perfectly circular logic, the Plaintiff alleges that the Defendants violated his free speech rights by denying him medical care, in retaliation for his having expressed his desire to receive medical care.

The discovery in this matter has revealed no evidence which would support Plaintiff's claim of First Amendment retaliation.

In order to prove a claim of First Amendment retaliation, an inmate must be able to demonstrate:

> (1) constitutionally protected conduct,  (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and  (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.

Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  The constitutionally protected conduct must also have been "a substantial or motivating factor in the decision to take adverse action."  Carter v. McGrady, 292 F.3d 152, 157 (3d Cir. 2002).  Further, the inmate "bears the initial burden of showing that the 'constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him.'"  Glenn v. Diddle, 252 Fed. Appx. 493, 499 (3d Cir. 2007), quoting Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001).

In this case, the Plaintiff claims that because he repeatedly expressed his desire to be provided with medical care, he suffered retaliation in the form of the defendants refusing to provide him with that medical care.  The Plaintiff, at once alleges that he suffered retaliation in the form of the denial of medical care *because* he complained about the denied of medical care.  This apparently circular reasoning is supported by no evidence, and rests entirely upon the Plaintiff's own supposition.  Such supposition, bereft of any evidence, fails to support a claim for First Amendment retaliation.

In the Glenn case, the Third Circuit similarly considered the claim of inmate, Glenn, who had alleged, *inter alia*, that he was retaliated against by the defendants for having exercised his First Amendment rights.  252 Fed. Appx., at 499.  Specifically, Glenn alleged that the defendant "threatened disciplinary action because  [he]  filed grievances criticizing the medical care he was receiving," and that "the defendants provided him with inadequate medical care in retaliation for expressing dissatisfaction with the treatment that he was receiving."  Id.   The Third Circuit, in

holding that Glenn had failed to state a claim for retaliation under the First Amendment, found

that:

> [H]e does not suggest in his complaint that any of these activities led to adverse action likely to prevent or otherwise discourage a person of ordinary firmness from engaging in the protected conduct. . . .
>
> Furthermore, we cannot reasonably infer from the allegations in [the] complaint that Glenn's criticisms caused him to receive inadequate medical care. The complaint fails to suggest any nexus between Glenn's expressive conduct and the quality of the treatment he received, and the mere fact that mistakes were made during the course of the treatment is not so extraordinary as to give rise to an inference of retaliatory conduct.

Id., citing Cain v. Lane, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988) ("the prisoner must allege a

chronology of events from which retaliation may plausibly be inferred"). See also, Benson v.

Cady, 761 F.2d 335, 342 (7th Cir. 1985) (holding that "alleging merely the ultimate fact of

retaliation is insufficient").

      As in Glenn, the Plaintiff merely asserts the ultimate conclusion that the Defendants

retaliated against him by denying him medical care, as a consequence of his having complained

about and/or having demanded that he be provided with medical care. There exists no evidence

which would support these conclusions, no evidence that any of the Defendants' actions were

taken in retaliation, and no evidence that any alleged deliberate indifference was causally related

to the Plaintiff's exercise of his rights under the First Amendment. The Plaintiff has done

nothing more than merely asserts the conclusion: *I asked for medical treatment, I complained*

*about the lack of medical treatment, and therefore I was retaliated against.*

      The Plaintiff's claim of violation of rights under the First Amendment to the United

States Constitution is unsupported by any evidence, and the Plaintiff's claim as against the

defendants must therefore be dismissed with prejudice.

## <u>CONCLUSION</u>

Accordingly, and for the reasons set forth herein, it is respectfully requested that this Honorable Court grant the Motion for Summary Judgment of Defendants, Corizon, Inc., F/K/A Correctional Medical Services, Inc., Allan Martin, M.D., Lionel Anicette, M.D.., Yasser Soliman, M.D. and David Meeker, and dismiss all claims against them with prejudice.

Respectfully submitted,

MARKS, O'NEILL, O'BRIEN,
DOHERTY & KELLY, P.C.

_____/s/  Sean Robins_____
Sean Robins, Esquire
Sean X. Kelly, Esquire
Attorneys for Defendants,
Corizon, Inc., F/K/A Correctional Medical Services,
Inc., Allan Martin, M.D., Lionel Anicette, M.D..,
Yasser Soliman, M.D. and David Meeker

DATE: _____September 22, 2014_____

43