<u>NOT FOR PUBLICATION</u>                                                                    (Doc. No. 113)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                                            :
ELVIS SOTO-MUNIZ,                            :
                                                            :          Civil No. 10-3617 (RBK/KMW)
                              Plaintiff,        :
                                                            :
              v.                                         :          **OPINION**
                                                            :
CORIZON, INC. f/k/a CORRECTIONAL   :
MEDICAL SERVICES, INC., et al.             :
                                                            :
                              Defendants.    :
_____ :

**KUGLER**, United States District Judge:

      This matter arises out of Elvis Soto-Muniz's ("Plaintiff") incarceration at South Woods

State Prison ("SWSP").  During a two-week period, Plaintiff claims to have been deprived of

adequate medical treatment in violation of his constitutional rights.  Defendants in this action are

Corizon, Inc. f/k/a Correctional Medical Services, Inc. ("CMS"), David Meeker ("Meeker"), Dr.

Allan Martin ("Martin"), Dr. Lionel Anicette ("Anicette"), and Dr. Yasser Soliman ("Soliman")

(collectively "Defendants").  The matter is currently before the Court on Defendants' Motion for

Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. No. 113).

      For the reasons hereinafter recited, Defendants' Motion will be **GRANTED**.

## I.     FACTUAL BACKGROUND[1]

Plaintiff suffers from ulcerative colitis, an inflammatory bowel disease.  (Amended Complaint ("Compl.") ¶ 19; Defs.' Statement of Uncontested Facts ("Defs.' SMF") ¶ 9.)[2]  Prior to July and August of 2008, Plaintiff managed his ulcerative colitis with medication and the occasional "professional medical intervention in a clinical or hospital setting."  (Id.)  However, "if [ulcerative colitis] symptoms cannot be controlled, a surgical removal of the colon and rectum may be required."  (Id.)

In May of 2008, Plaintiff presented at Bergen Regional Medical Center ("BRMC") with complications resulting from his ulcerative colitis and was admitted for treatment.  (Id. ¶ 11.)  Plaintiff responded well to this treatment and was subsequently discharged from BRMC.  (Id.)  After being sentenced in connection with a criminal matter and held at the Bergen County Jail, (Compl. ¶ 29), on or about July 10, 2008, Plaintiff was transferred to the custody of the New Jersey State Department of Corrections ("NJDOC") and sent to NJDOC's Central Reception and Assignment Facility ("CRAF").  (Defs.' SMF ¶¶ 12, 24.)

On July 10, 2008, Plaintiff was seen at CRAF Nursing Intake by Giselle Williams, LPN, who noted on Plaintiff's Electronic Medical Record ("EMR") that Plaintiff had been hospitalized two months earlier, and had a history of hepatitis C and ulcerative colitis.  (Id. ¶ 25.)  Nurse Williams also noted that Plaintiff had been on the medications Asacol and Omeprazole.  (Id.)  That same day, Plaintiff was seen at Physician Intake by Sharon Levin, RN, NP, who noted

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

[2] The Court references Defendants' Statement of Uncontested Facts ("Defs.' SMF") for all facts that are not disputed by the parties.  See Hill v. Algor, 85 F. Supp. 29 391, 408 n.26 (D.N.J. 2000) ("[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.")

Plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding.  (Id. ¶ 26.)  Nurse Levin also noted Plaintiff's history of IV drug use and use of cocaine, and placed Plaintiff on Sulfasalazine 500 mg, three times per day and Prilosec 20 mg daily.  (Id.)  Finally, Nurse Levin also ordered lab testing.  (Id.)  The lab test results were received on July 11, 2008, including results for CBC and platelets.  (Id. ¶ 27.)

On July 15, 2008, Plaintiff was seen at Sick Call with Phyllis Hewins, RN, with a complaint that his "meds [were] not working for ulcerative colitis," that he had nausea for three days, and that he was not able to eat, though he was drinking liquids.  (Id. ¶ 28.)  He also reported being in pain, with cramping and a "small amount of loose BM."  (Id.)  For his pain, Plaintiff was provided with Acetaminophen 325 mg, two tablets two to three times daily, and provided with a supply to self-dispense.  (Id.)

The next day, July 16, 2008, Plaintiff was again seen at Sick Call, this time with Grace Melendez, M.D., with a complaint that he felt lightheaded.  (Id. ¶ 29.)  During his visit with Dr. Melendez, Plaintiff reported that he had ulcerative colitis for the past seven years and that he had been hospitalized eight times since September 2007.  (Id.)  In her notes, Dr. Melendez recorded that Plaintiff's illness was chronic, that he needed IV hydration, prednisone, and a gastrointestinal ("GI") consult, and that Plaintiff had been accepted for transfer to the infirmary at SWSP.  (Id.)

Plaintiff was transferred to SWSP on July 17, 2008.  (Id. ¶ 30.)  Upon arrival at SWSP, he was seen by Jennifer Kuty, RN, during a Nurse Transfer Admission Assessment.  (Id.)  Nurse Kuty noted that Plaintiff stated he had no appetite, had been "bleeding rectally for a month" but that he had not vomited blood; noted Plaintiff's history of ulcerative colitis, diabetes mellitus, and rectal bleeding; and noted that Plaintiff was taking Sulfasalazine 500 mg, three times per

3

day, Prilosec 20 mg, daily, and Acetaminophen 325 mg, two tablets two to three times per day.

(Id.)  Lisa Renee Mills, RN, also noted an order upon admission to the infirmary, to "push oral

fluids," and for administration of IV fluids for dehydration for Plaintiff that day.  (Id. ¶ 31.)  That

same day, Gail Willett, RN, saw Plaintiff as part of Infirmary Rounds Admission, and noted that

Plaintiff told her he felt nauseous "on and off," but that he was experiencing no vomiting.  (Id. ¶

32.)  Plaintiff also related that he had a seven year history of ulcerative colitis, diabetes mellitus,

and a history of rectal bleeding, including "intermittent" rectal bleeding during the prior month.

(Id.)  Nurse Willett noted that Plaintiff presented "pale in color" and "slightly dehydrated" and

that he stated that he had abdominal pain due to his colitis.  (Id.)  She also noted that Plaintiff's

weight was 139 pounds.  (Id.)  Finally, Nurse Willett noted that she had attempted to start an IV

for administration of fluids "but due to extensive heroin use of veins" she was "unable to start

line after [six] attempts."  In lieu of an IV, she explained that Plaintiff was given oral fluids and

encouraged to drink as much as he could, which Plaintiff agreed to comply with.  (Id.)

Plaintiff was seen in Infirmary Rounds on July 18, 2008 by Linda Bigay, RN, James R.

Welch, RN, Clevelyn Ricalde, RN, Stephanie Kulda, RN, and Martin.  (Id. ¶¶ 33-37.)  Nurse

Bigay noted that she had attempted to insert a heparin lock unsuccessfully, and had instructed

Plaintiff to continue drinking copious amounts of fluids until the next nurse came to insert a

"Hep-lock."  (Id. ¶ 33.)  She also noted Plaintiff's weight to be 139 pounds.  (Id.)  Later, James

R. Welch, RN, noted Plaintiff's complaint of diarrhea.  (Id. ¶ 34.)  After Martin saw Plaintiff,

Nurse Ricalde noted that Plaintiff was alert and "oriented x3," with regular respirations, but

complained of abdominal pain and diarrhea.  (Id. ¶ 36.)  Nurse Ricalde also "encouraged more

fluid intake" for Plaintiff.  (Id.)  When Nurse Smith saw Plaintiff, she too noted that he was alert

and "oriented x3," but that he had not eaten breakfast due to his abdominal pain.  (Id. ¶ 37.)  She

recorded that she provided Plaintiff with Boost (a liquid nutritional supplement), and that there were no complaints of diarrhea during her shift.  (Id.)  Plaintiff was again encouraged to drink more water, which he expressed assent to, and his weight was recorded at 139 pounds.  (Id.)

Martin had not seen Plaintiff on July 17 because he had not been working that day.  (Id. ¶ 65.)  When Martin saw Plaintiff for the first time on July 18, 2008, he examined and evaluated Plaintiff.  (Id. ¶ 35.)  Martin claims that Plaintiff's SWSP intake records from July 17, 2008, indicated that his vital signs were stable and that he was hemodynamically stable.  (Id. ¶ 68.)  Plaintiff appeared chronically ill, pale, alert, and responsive, but did not appear to be in any acute distress.  (Id. ¶ 71.)[3]  As part of his GI examination of Plaintiff, Martin noted some tenderness in the abdomen, which was not distended, noted no peritoneal irritation, and, other than the tenderness in the lower abdomen, the exam was normal.  (Id.)  Plaintiff was started on further treatment for his symptoms, including additional anti-inflammatory medication and stronger pain medication.  (Id. ¶¶ 70, 73.)  Plaintiff was given Prednisone along with Prilosec, and Vicodin[4] instead of acetaminophen.  (Id. ¶ 70.)  According to Martin, Plaintiff was not placed on Remicade, one of the medications used to medically control ulcerative colitis, because Martin had prescribed Sulfasalazine and Prednisone, which together will also generally control

---

[3] The Court notes that, in several instances found in Plaintiff's Responsive Statement of Material Facts, Plaintiff attempts to dispute a fact asserted and supported from the record by Defendants, without supporting his position with a citation to the record, or by attempting to deny a fact not actually asserted by Defendants.  (See e.g., Pl.'s Responsive Statement of Material Facts ("Pl.'s RSF") ¶¶ 14, 17, 18, 68, 71, 73, 74, 75, 94, 97, 104, 105, 164, 187, 190.)  Such assertions are insufficient to create an actual dispute of fact, and the Court will regard these paragraphs as undisputed for purposes of this Motion.  See Walters v. Carson, No. 11-6545, 2013 WL 6734257, at * (D.N.J. Dec. 19, 2013) (noting that, where the plaintiff denied the defendants' material fact, but cited to no record evidence and offered only argument in response, legal argument alone "fails to satisfy Plaintiff's obligation under Local Rule 56.1."); Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth., No. 12-3427, 2014 WL 268652, at *5 n.4 (D.N.J. Jan. 23, 2014) (admonishing the defendant for claiming facts were disputed when they were not, and noting that "any statement that is not explicitly denied with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted.")

[4] It appears Plaintiff was in fact prescribed Hydrocodone-Acetaminophen 5-500 mg, two tablets three times daily.  (See, e.g., Defs.' SMF ¶¶ 49, 57.)

ulcerative colitis.  (Id. ¶ 86.)  He testified that "there was no way to get an IV" in Plaintiff's veins

"due to heroin use," so Plaintiff would need to continue "hydration by mouth," which he had

been doing.  (Id. ¶ 73.)  Martin also believed that the only form of available IV hydration that

could have been obtained in light of Plaintiff's condition was with a subclavian line, which

would have needed to be done in a hospital setting.  (Id. ¶ 75.)  Because Plaintiff was able to and

was taking hydration orally, Martin determined that an IV was not necessary.  (Id. (testifying at

his deposition that "[Plaintiff] was eating.  He was drinking.  If someone is eating and drinking,

there is no need to [administer IV hydration].  If they're clinically stable, there is no need to do

this; hemostatically stable, there is no need to do it."))  He noted that CRAF had also had a

problem getting an IV in Plaintiff, which is why he was passed on to SWSP, but because

Plaintiff was not throwing up, they would continue to encourage as much oral liquid and

supplemental intake as possible.  (Id. ¶¶ 73-75 (also testifying that CRAF "recommended an IV

hydration.  We did not do that.  This came with him."))  Finally, Martin generated a request for a

GI consult that day as well.  (Id. ¶ 72.)

Plaintiff continued to be seen in Infirmary Rounds between July 19 and 21, 2008.  (See

id. ¶¶ 38-43.)  Christina Gray, RN saw Plaintiff on July 19, noting Plaintiff was alert and

oriented, in no distress, but had complaints of symptoms of weakness and anorexia.  (Id. ¶ 38.)

Plaintiff also admitted to Nurse Gray that he had eaten breakfast and had been utilizing

supplements, such as Boost, for added nutrition.  (Id.)  Nurse Gray recorded Plaintiff's weight at

139 pounds.  (Id.)  On July 20, Plaintiff was seen by Nurse Welch, who noted Plaintiff's

complaints of diarrhea with blood, a change in bowel habits, and abdominal pain, but also noted

that there had been "no diarrhea this shift."  (Id. ¶ 39.)  She also noted Plaintiff's weight was 139

pounds.  (Id.)  Later, Nurse Kulda saw Plaintiff and noted that he was alert and oriented, that he

appeared weak, that he had a history of ulcerative colitis and diarrhea, but that there had been "no diarrhea this shift." (Id. ¶ 40.)  Nurse Kulda also noted that Plaintiff was "drinking fluids," but was "tolerating little foods," though he "denied urinary problems." (Id.)  Plaintiff's weight was also 139 pounds. (Id.)  Nurse Gray also saw Plaintiff on July 20, noting that he was alert and oriented, in no apparent distress, but had "continued diarrhea." (Id. ¶ 41.)  According to Nurse Gray, Plaintiff had "no new complaints," and was "increasing fluids as instructed." (Id.)  Plaintiff's weight was still at 139 pounds. (Id.)  On July 21 Nurse Bigay saw Plaintiff, noting that he denied having any loose stools during her shift, but that he would let her know if any occurred. (Id. ¶ 42.)  She also noted that Plaintiff told her he was feeling better, and recorded his weight at 139 pounds again. (Id.)  Nurse Welch saw Plaintiff that day as well, noting Plaintiff's weight to be 139 pounds. (Id. ¶ 43.)

Martin saw Plaintiff for the second time on July 21, at which time he examined and evaluated Plaintiff, noting complaints of fatigue and malaise, with diarrhea, abdominal pain, and melena, though Plaintiff denied having any nausea, vomiting, or constipation. (Id. ¶ 44.)  Plaintiff's complaints of abdominal pain were "mostly in the lower abdomen," and his "number of stools [had] decreased since 3 days [prior]," though he did report that his stools were bloody. (Id.)  Martin wrote that the plan was discharge Plaintiff to general population, and he ordered lab testing and a GI consult. (Id.)  On July 21, 2008, Martin completed and submitted a consult referral form for the Plaintiff for a GI consult, noting in the referral request that "[Plaintiff] has [a history of] ulcerative colitis, that has been refractory to several medical treatments.  He states that he has been on asacol, remicade, and prednisone at various times [without] success.  He has cont[inued] to have abd[ominal] pain and rectal bleeding.  [Please] evaluate." (Id. ¶ 46.)  Yasser Soliman, M.D., signed off on the request on July 22, 2008, and on July 23, 2008, Carmen

Gaebler, RN, approved the request.  (Id.)  The GI consult was scheduled to take place on August 13, 2008 at New Jersey State Prison ("NJSP").  (Id.)

On July 21, 2008, Plaintiff was discharged to the general population, with instructions provided by Nurse Ricalde, who told Plaintiff to "go to med line to get his medications," and to "report to medical for any symptoms."  (Id. ¶ 45.)  Nurse Ricalde noted that Plaintiff verbalized his understanding of those instructions, told her he was feeling better, and "left the unit ambulatory and in no distress."  (Id.)

Four days later, on July 25, 2008, Plaintiff was seen at Sick Call by Mary Ellen Green, RN, who noted Plaintiff complained of nausea, hematochezia (blood in his stools), poor appetite, and weakness, but that he denied any vomiting, diarrhea, constipation, change in bowel habits, abdominal pain, or melena at the time.  (Id. ¶ 49.)  Nurse Mary Ellen Green also noted that Nurse Fran Green had spoken with Plaintiff with respect to his "plan of care," and told Plaintiff that there was a GI consult pending and lab testing had been ordered for the following Monday.  (Id.)  Plaintiff also indicated to Nurse Mary Ellen Green that he was aware of his needs for fluid and rest, and she noted further that his current medications included Sulfasalazine 500 mg, three times daily, Prilosec 20 mg, daily, Prednisone 20 mg, two tablets daily, Twocal HN Liquid (nutritional supplement), one can three times daily, and Hydrocodone-Acetaminophen 5-500 mg, two tablets three times daily.  (Id.)  On July 30, 2008, Jackyline Carrero, health services technician ("HST II"), noted that lab testing, including a comprehensive metabolic panel ("CMP"), CBC, and platelets had been ordered by Martin, and drawn.  (Id. ¶ 50.)  Martin reviewed and charted the results of Plaintiff's lab testing on August 1, 2008.  (Id. ¶ 52.)

Nurse Fran Green saw Plaintiff at Sick Call on August 1, noting that he complained of nausea, abdominal pain, melena, hematochezia, loss of appetite, and weight loss, though he

denied any vomiting or diarrhea at the time.  (Id. ¶ 51.)  Nurse Fran Green noted as the plan:

"Admit to infirmary for IVF and steroid therapy," and noted that lab testing had been ordered

and obtained on July 30, and that a GI consult was pending.  (Id.)  She also noted at the time that

Plaintiff weighed 133 pounds.  (Id.)  Plaintiff was transferred to the Infirmary at that time.  (Id.)

 Martin saw Plaintiff in Infirmary Rounds later on August 1, after he had been transferred

to the Infirmary, and noted that Plaintiff complained of anorexia, weight loss, abdominal pain,

and hematochezia.  (Id. ¶ 53.)  Plaintiff was "chronically ill appearing," was in bed, but was in

no apparent distress.  (Id.)  At the time, Martin noted that the GI consult was pending, scheduled

for August 13, 2008, that they were to continue "supportive care."  (Id.)  Because Martin did not

find "anything acute going on that warranted him to be in [the Infirmary]," and noted that

Plaintiff's weight was stable and his blood pressure was good, Plaintiff was discharged to

general population.  (Id. ¶¶ 53, 94.)  A stool occult blood test was also ordered and obtained on

August 1, and on August 5, 2008, the results of that test, which were "negative," were received

and charted by Avynne Hester, PA-C.  (Id. ¶ 55.)

 On August 4, 2008, Plaintiff submitted a Health Services Request Form ("HSRF"), in

which he stated that he wanted to check on the results of lab testing, and that he "lost 27 lbs. and

[could] no longer walk or control [his] bowel movement."  (Id. ¶ 54.)  He further stated a request

for "antibiotics, steroids and fluids intravenously to control my colitis problem."  (Id.)  The

HSRF notes that he was "Triaged 8/4/08."  (Id.)  On August 5, 2008, Plaintiff was seen at Sick

Call by Nurse Mary Ellen Green, consequent to his HSRF.  (Id. ¶ 56.)  Nurse Mary Ellen Green

noted complaints of anorexia, fatigue, malaise, and weight loss, and that Plaintiff denied

vomiting, constipation, and melena.  (Id.)  She noted that "[Plaintiff] persists in having loose

bloody stools and is up most [nights] in [the bathroom] and not able to sleep."  (Id.)  Plaintiff's

weight was 130 pounds at that time, and Nurse Mary Ellen Green noted that his "[c]olor [was] sallow and [his] face drawn in appearance with dark circles and sunken eyes." (Id.) She provided Plaintiff with a wheelchair, and wrote that he needed a lower floor and bunk due to his "present weakness and malaise." (Id.) Plaintiff's medications were also noted as Sulfasalazine 500 mg, three times daily, Prilosec 20 mg, daily, Prednisone 20 mg, two tablets daily, Twocal HN Liquid, one can three times daily, and Hydrocodone-Acetaminophen 5-500 mg, two tablets three times daily. (Id. ¶ 57.) Nurse Fran Green also ordered an "increased fluid intake" and "bottom floor, bottom bunk, and [wheelchair]" for Plaintiff on August 5. (Id.)

Plaintiff was seen by Nurse Fran Green the morning of August 6, 2008, in an "Office Visit – Follow Up," at which she examined and evaluated him. (Id. ¶ 58.) At that time, Nurse Green noted that Plaintiff weighed 132 pounds, his blood pressure was 110 over 80, and he had a pulse of 100 beats per minute. (Id.) Plaintiff complained of anorexia, fatigue, malaise, and weight loss, and appeared thin and malnourished, with "generalized weakness." (Id.) He further complained of nausea, diarrhea, abdominal pain, and blood in his stool, though denied vomiting. (Id.) Following her examination with Plaintiff, Nurse Fran Green contacted Martin and reviewed her evaluation and assessment with him. (Id. ¶ 59.) Martin agreed with Nurse Fran Green's assessment, and she noted in Plaintiff's EMR, "[r]eviewed with Dr. Martin; send to [St. Francis Medical Center] via state van for follow-up [treatment]." (Id.) Nurse Fran Green then charted the order for Plaintiff to be sent to St. Francis Medical Center ("SFMC") ER "via State Van for medical evaluation and [treatment]." (Id.) Shortly after arriving at SFMC, Plaintiff underwent a surgery to remove his colon, and a few months after that underwent a second surgery to remove his rectum. (See id. ¶¶ 131, 133, 204.)

Plaintiff does not dispute any of the events that occurred, but does dispute whether the medical decisions made by Martin and others were knowingly inadequate.  (See Pl.'s Opp'n at 11.)  He relies on the expert medical opinion reports of Brian G. Turner, M.D. ("Turner"), in support of his position.  (See Ex. 1 to Richman Decl., Expert Medical Opinion Report of Brian G. Turner, M.D. ("Turner Report"); Ex. 2 to Richman Decl., Rebuttal to Expert Reports of Dr. Larry Borowsky and Dr. Nathaniel Evans ("Turner Rebuttal").)  Turner opined that Plaintiff's care was "not only delayed, but also inadequate based on the severity of his known disease (established based on prior records reviewed by the treating individuals in this case)."  (Turner Report ¶ 11.)  He claims that the treating individuals did not seek or insist on a higher level of care for Plaintiff in the medical center, even though they recognized the need to place an IV line and check labs, but "could not perform what they knew was appropriate" in the Infirmary.  (Id.)  According to Turner, the issues with Plaintiff's treatment included: the failure to treat Plaintiff's dehydration without intravenous fluid ("IVF") and an IV, improper medication being given to Plaintiff, no GI consultation was performed, no acknowledgment by medical staff of Plaintiff's medical signs indicating severe dehydration, delay in care on multiple occasions, and severe exacerbation of ulcerative colitis due to poor care, which necessitated surgical intervention.  (Id. ¶ 13.)  The treating officials failed to diagnose, treat, or adequately acknowledge that:

- As a result of her July 16, 2008, examination of Plaintiff at CRAF, Dr. Melendez indicated that he needed "IV hydration," a "GI consult," and "prednisone."  (Id. ¶ 16.)

- Plaintiff's tachycardia (high pulse rate), which indicated a degree of dehydration, manifested as early as July 15, 2008 (See id. ¶¶ 15-16, 19.)  When Plaintiff had a

pulse of 117 on July 19, 2008, he should have been hospitalized due to his tachycardia and lack of IV fluid access.  (Id. ¶ 19.)

- Plaintiff's complaints of tasting blood in his mouth, rectal bleeding for an extended period of time, and pain in his eyes were all signs of severe dehydration and disease. (Id. ¶ 17.)  A healthcare provider should understand and recognize that severe dehydration from fluid (diarrhea) and blood loss (rectal bleeding) can result in damage to organs such as the kidneys and colon.  (Id. ¶ 18.)

- Plaintiff's treatment providers should have considered that he would be severely anemic (low blood count) due to his long term bleeding, and this would contribute to his dehydration and the worsening of his ulcerative colitis flare.  The fact that they requested a CBC shows they recognized this possibility.  (Id. ¶ 19.) Plaintiff's lower blood pressure and tachycardia put him at risk of kidney compromise and possible damage to the colon as the result of low blood flow, without proper IV fluid hydration.  (Id. ¶ 18.)

- IV access to facilitate the administration of IV steroids (Prednisone) and hydrating fluids were critical to the treatment of Plaintiff's ulcerative colitis and dehydration.  (Id.)  By July 20, 2008, given the persistence of Plaintiff's tachycardia, oral hydration was clearly inadequate.  (Id. ¶ 20.)  Plaintiff's oral steroids and liquid nutritional supplements were insufficient to hydrate him in the instance of severe active colitis, and he should have been receiving IV steroids and fluids.  (Id. ¶ 24.)

- Plaintiff's severe dehydration as of July 21, 2008, indicated that he should have be admitted to an inpatient facility, rather than placed in general population.  (Id.

¶ 21.)  He should have been transferred to a facility capable of placing an IV or even a central venus catheter.  (<u>Id.</u> ¶ 24.)  In total, Plaintiff went close to four weeks without IV fluid hydration or IV medications to treat his underlying disease.

- Plaintiff needed a GI consult, and though Martin requested a GI consult on July 18, 2008, it appears it was not until after his second GI consult request on July 21, 2008, that his request was granted.  (<u>See id.</u> ¶ 21.)  The GI consult was not performed before Plaintiff was transferred to SFMC.  (<u>See id.</u> ¶ 13.)

According to Turner, the "lack of appropriate care and the subsequent delays in care resulted in surgical intervention due to the presence of fulminant colitis."  (<u>Id.</u> ¶ 26.)

Conversely, Defendants claim the actions of the individuals who treated Plaintiff in July and early August 2008 were reasonable under the circumstances.  They assert Martin was reasonable in deciding to place Plaintiff in general population on July 21, 2008, and August 1, 2008, that treatment with oral hydration was adequate under the circumstances, and Plaintiff was scheduled for a GI consult as soon as practicable within the context of SWSP's approval process for such examinations.

Martin testified that Plaintiff was clinically stable each time he was transferred from the Infirmary back to general population.  (Defs.' SMF ¶¶ 77, 94, 97.)  The lab results from testing ordered at CRAF on July 11, 2008, indicating a normal blood count and having no indication of any acute problem, were available to Martin in Plaintiff's EMR on July 18, 2008.  (<u>Id.</u> ¶ 81.)  On July 21, 2008, Martin noted that Plaintiff appeared stable from his exam, and able to enter general population.  (<u>Id.</u> ¶ 77.)  Plaintiff's blood pressure was 120 over 70, his heart rate was at 88 beats per minute, he complained of nausea and some diarrhea, but he was feeling better on

that day and the number of his stools had decreased.  (Id.)  Martin did not believe that Plaintiff was "acutely ill enough to be in the infirmary in the extended care unit."  (Id.)  Plaintiff's change in results between July 12, 2008, and August 1, 2008, indicated to Martin a chronic or "slow bleed," rather than an acute bleed.  (Id. ¶ 96.)  He testified that, most of the time, when there is bleeding with ulcerative colitis, it is a "slow, chronic bleed that's occurring as opposed to a massive, sudden gush of bright red blood."  (Id. ¶ 84.)  Martin also explained that the types of treatment needed for ulcerative colitis depend on whether the condition is active or acute.  (Id.) According to Martin, a body adjusts to a "slow bleed" over time.  (Id. ¶ 96.)  Martin testified that Plaintiff's ulcerative colitis was chronic, that it "waxe[d] and wane[d]," (id. ¶ 85), and that prior to Plaintiff's transfer to SFMC it was "not obvious" that Plaintiff was not responding to the medications being given.  (Id. ¶ 93.)  It was not until August 6, 2008, when Plaintiff had failed to respond to treatment after "almost three weeks," and had presented to Nurse Fran Green for the last time, that Martin decided Plaintiff needed to be sent to SFMC for an evaluation prior to his GI consult.  (Id. ¶¶ 99-101.)  At that time, Plaintiff was experiencing an "acute flare," according to Martin, and Plaintiff's chart indicated that he "might require a total colectomy for relief of his intractable colitis symptoms."  (Id. ¶ 91.)

Moreover, if an inmate was sent to the Infirmary for the purpose of IV hydration, and the plan changed to oral hydration due to an inability to start an IV, there would be no reason for the patient to remain in the Infirmary.  (Id. ¶ 108.)  Defendants believed that oral hydration was an acceptable alternative to IV hydration where it was not possible to start an IV due to Plaintiff's prior drug use.  (See, e.g., Ex. C to Robins Cert., Deposition Testimony of Martin ("Martin Dep.") at 168-69; id. Ex. I to Robins Cert., Deposition Testimony of Nurse Fran Green ("Green

Dep.") at 79-80, 129-30, 142, 144-45; Ex. E to Robins Cert., Deposition Testimony of

Madanmohan R. Patel, M.D. ("Patel Dep.") at 47-48.)

      As for Plaintiff's GI consult, Martin submitted the consult request on July 21, 2008, it

needed to be approved by the medical director or associate state medical director first, and then

once it was approved it would be scheduled.  (Defs.' SMF ¶ 78.)  Soliman approved the GI

consult on July 22, 2008, and the consult was scheduled to take place on August 13, 2008, in the

New Jersey State Prison.  (Id. ¶ 79.)

## II.   PROCEDURAL HISTORY

      On April 30, 2010, Plaintiff filed a complaint in the United States District Court for the

Eastern District of New York against NJDOC, The Health Services Unit (the "HSU"), SWSP,

Defendant Martin, and John Does #1-5 (the "original Complaint").  (See generally Doc. No. 1.)

The case was subsequently transferred to the District of New Jersey.  (Doc. No. 10.)  On October

15, 2010, Plaintiff voluntarily dismissed his claims against NJDOC, the HSU, and SWSP.  (Doc.

No. 24.)  On November 15, 2010, Defendant Martin answered the original Complaint and

discovery commenced.  (Doc. Nos. 25, 29.)

      On July 13, 2012, Plaintiff filed a Motion for Leave to Amend his Complaint in order to

add CMS, Meeker, Anicette, and Soliman as Defendants.  (Doc. No. 61.)  The Court granted

Plaintiff's Motion and Plaintiff filed his Amended Complaint against Defendants on October 5,

2012.  Plaintiff's Amended Complaint asserts the following claims against all Defendants: a 42

U.S.C. § 1983 claim for cruel and unusual punishment in violation of the Eighth Amendment

(Count I); a § 1983 claim for retaliation against free expression in violation of the First

Amendment (Count II); a § 1983 entity liability (Monell) claim for cruel and unusual punishment

in violation of the Eight Amendment (Count III).  (See Compl. ¶¶ 83-113.)

On September 30, 2013, the Court denied Defendants' Motions to Dismiss.  (Doc. No. 95.)  After the close of discovery, Defendants filed the present Motion for Summary Judgment with respect to each of Plaintiff's claims.  (Doc. No. 113.)  Defendants advance several arguments in support of their motion, but Plaintiff has voluntarily withdrawn all claims except his § 1983 claim for cruel and unusual punishment in violation of the Eighth Amendment against Martin.  (See Pl.'s Opp'n at 12, 14 (withdrawing "custom or policy" claims, withdrawing all allegations to the extent they rely upon respondeat superior liability, and withdrawing the claim that Defendants violated his First Amendment rights); see also id. at 4-11 (stating opposition to Defendants' Motion only with respect to Martin); cf. Opinion on Defendants' Motions to Dismiss (Doc. No. 94) at 16-19 (construing Plaintiff's claims against Meeker, Anicette, Yasser, and Soliman in their official capacities as claims against CMS, and upholding claims against Meeker, Anicette, Yasser, and Soliman in their individual capacities based on their possible roles as policy- or custom-makers).)[5]  As the present Motion has been fully briefed, the Court will proceed to address the parties' arguments.[6]

---

[5] Plaintiff apparently attempts to "reserve the right to reinstate his [custom or policy] claims if [the] deposition of Mr. Meeker shows that CMS did, in fact, have a custom or policy that resulted in deliberate indifference to Plaintiff's serious medical needs."  (Pl.'s Opp'n at 12.)  However, as Plaintiff is faced with substantive arguments made by Defendants in favor of granting summary judgment on Plaintiff's custom or policy claims against CMS, Meeker, Anicette, Soliman, and Yasser, he cannot circumvent the Court's analysis of his claims and the record evidence by voluntarily withdrawing his claim at this time, with the caveat that he may reinstate the claim at some point when he obtains sufficient evidence.  Accordingly, so far as Plaintiff has not actually voluntarily withdrawn his claim or consented to summary judgment, as he does with respect to any respondeat superior liability claims, and his claim that Defendants violated his First Amendment rights, the Court discusses, infra at Part IV.b, the lack of any evidence on the record supporting Plaintiff's § 1983 custom or policy claim for a violation of the Eighth Amendment.

[6] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities."  Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)).  "This may be done upon motion of a party or the Court."  Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).  Here, Plaintiff has failed to amend his Amended

### III.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact.  Anderson, 477 U.S. at 248.  Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor.  Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment.  Anderson, 477 U.S. at 256.  The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor.  Id. at 257.  The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

Complaint or otherwise identify any of the fictitious defendants despite the fact that discovery has now closed. Thus, these parties shall be dismissed.

**IV.     DISCUSSION**

**A.      Deliberate Indifference to Serious Medical Needs (Count I)**

Section 1983 affords a cause of action for certain violations of an individual's

constitutional rights.  The statute provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen
> of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983.  In order to state a claim for relief under § 1983, a plaintiff must allege, first,

the violation of a right secured by the Constitution or laws of the United States and, second, that

the alleged deprivation was committed or caused by a person acting under color of state law.  See

West v. Atkins, 487 U.S. 42, 48 (1988); Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011);

Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

Plaintiff alleges that Martin violated his Eighth Amendment rights by "deliberately and

intentionally fail[ing] to provide the necessary treatment for Plaintiff's ulcerative colitis . . .

[d]espite having knowledge of Plaintiff's serious medical needs."  (Compl. ¶ 84).  Defendants

argue that Plaintiff has failed to establish that Martin acted with deliberate indifference to

Plaintiff's serious medical need.  Plaintiff disagrees.

Under the Eighth Amendment, a prisoner has a right to be free from cruel and unusual

punishment, which includes deliberate indifference to a prisoner's serious medical needs.  Ham

v. Greer, 269 Fed. App'x 149, 151 (3d Cir. 2008) (citing Estelle v. Gamble, 429 U.S. 97, 104

(1976)).  To properly state a claim for a violation of the Eighth Amendment, Plaintiff must

allege:  (1) a serious medical need; and (2) acts or omissions by prison officials that indicate

deliberate indifference to that need.  See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

"A medical need is serious if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Maldonado v. Terhune, 28 F. Supp. 2d 284, 289 (D.N.J. 1998) (internal quotation marks omitted).  Further if a denial or delay of medical attention "causes an inmate to suffer a life-long handicap or permanent loss", serious medical need may also be found.  Id. (quoting Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.1987), cert. denied, 486 U.S. 1006 (1988).  The parties do not dispute that Plaintiff's ulcerative colitis was a serious medical need.

Once a serious medical need has been shown, an inmate then must show that "prison officials acted with deliberate indifference to his serious medical need."  Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).  Deliberate indifference is manifest "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury' . . . . Similarly, where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met."  Monmouth Cnty., 834 F.2d at 346 (citations omitted); see also Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) ("When … prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of Estelle has been violated.") (citing West v. Keve, 571, F.2d 158, 162 (3d Cir. 1978)).  Deliberate indifference may also occur where a prison doctor "insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or

entailed substantial risk of serious harm to prisoners." White v. Napolean, 897 F.2d 103, 109 (3d Cir. 1990).

Deliberate indifference rises well above mere malpractice or negligence; "it is a state of mind equivalent to reckless disregard of a known risk of harm." Andrews v. Camden Cty., 95 F. Supp. 2d 217, 228 (D.N.J. 2000). A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. See id.; see also Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." White, 897 F.2d at 110; see Christy v. Robinson, 216 F. Supp. 2d 298, 413 (D.N.J. 2002) ("[A] misdiagnosis or preference for a certain type of treatment will not alone rise to the level of deliberate indifference.") "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Fantone v. Herbik, 528 Fed. App'x 123, 125 (3d Cir. 2013) (quoting United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 n.2 (3d Cir. 1979)). Thus, "[c]ourts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." Inmates of Allegheny, 612 F.2d at 762 (internal quotation marks omitted) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)); see also White, 897 F.2d at 110 ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.") For instance, "the question whether an X-ray or additional diagnostic

techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." Estelle, 429 U.S. at 107.

Generally, even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. See Estelle, 429 U.S. at 105-06; White, 897 F.2d at 110. However, while the test under Estelle "'affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients,' such diagnosis and treatment must be sufficiently informed so as not to suggest deliberate indifference on the part of [the defendant]." Hankey v. Wexford Health Sources, Inc., 383 Fed. App'x 165, 170 (3d Cir. 2010) (internal quotation marks omitted) (citing Inmates of Allegheny, 612 F.2d at 762). "Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny, 612 F.2d at 762; see also Goodrich v. Clinton Cnty. Prison, 214 Fed. App'x 105, 114 (3d Cir. 2007) (Pollak, J., dissenting) ("[W]hen an informed judgment has not been made—where, for example, the prison official in question does not have medical training—concerns about second-guessing professional determinations are simply not at issue.")

Defendants argue that Plaintiff has not demonstrated both that Martin, in responding to Plaintiff's medical needs, was objectively indifferent to his serious medical need, and that Martin had actual knowledge that his alleged actions or omissions presented a substantial risk of harm to Plaintiff. (Defs.' Br. at 5.) Further, Defendants argue that any disagreement Plaintiff has regarding the sufficiency of his treatment is insufficient to establish a claim of deliberate indifference. (Id. at 20.) Plaintiff responds by arguing that Martin was deliberately indifferent to Plaintiff's serious medical needs because he knew Plaintiff needed particular treatment and failed

21

to provide that treatment.  (Pl.'s Opp'n at 6-10.)  Plaintiff relies entirely upon the report of

Turner.  According to Turner's medical opinion, Plaintiff needed to receive IV hydration and

medication, Plaintiff's weight loss, worsening dehydration, and tachycardia needed immediate

attention that was not being given, Plaintiff should not have been discharged to general

population, and Martin failed to promptly obtain a GI consult for Plaintiff.  The Court finds that

Plaintiff has not submitted sufficient evidence, or shown a dispute as to certain material facts,

from which a jury could conclude that Martin was deliberately indifferent to Plaintiff's serious

medical needs.  It is undisputed that Plaintiff received some form of treatment while at SWSP.

Any dispute concerning the adequacy of Plaintiff's treatment sounds in negligence, as Plaintiff

has failed to adduce any evidence tending to show Martin's subjective indifference in making

treatment decisions concerning Plaintiff's care.

      First, Plaintiff has not shown that Martin lacked the knowledge, training, or experience to

make an informed medical judgment regarding the planned course of treatment for Plaintiff's

symptoms, or that a specialist with greater knowledge, training, or experience had ordered a

different, exclusive course of treatment that Martin was aware of.  See White 897 F.2d at 110

(noting that where the complaint did not allege that a prior doctor ordered treatment with a

particular drug exclusively, or that the prior doctor indicated the plaintiff's treatment would fail

if that was withheld, the plaintiff had failed to state a cause of action against the defendant for his

persistence in using a different drug to treat the plaintiff); Johnston v. Corr. Med. Servs., Inc. No.

05-5235, 2008 WL 5401636, at *7 (D.N.J. Dec. 23, 2008) (denying summary judgment where

the defendant knew a specialist had concluded that a cystectomy (or ileoconduit) was necessary

and the only way to get rid of the plaintiff's fistula; the defendant conceded that he lacked the

knowledge, training, or experience to second-guess the specialists' recommendations; and a fact-

finder could have concluded the defendant had "no medically justifiable reason for declining to provide Plaintiff with this [the necessary surgery] and was deliberately indifferent to the consequences of denying such treatment.")  Nor has Plaintiff offered evidence suggesting that Martin continued a course of conduct that he knew was painful, ineffective, or entailed a substantial risk of serious harm to Plaintiff.  White, 897 F.2d 109.

Defendants do not contest that Martin knew IV hydration would have been ideal, but they note that because an IV could not be placed due to Plaintiff's prior drug use, oral hydration and medication were used.  (See Martin Dep. at 168-69.)  It was Martin's opinion that oral hydration and medication were sufficient because Plaintiff was not throwing up, he was "stable," and he was able to eat and drink.  (Id. at 168:24-169:3 ("[Plaintiff] was eating.  [Plaintiff] was drinking. If someone is eating and drinking, there is no need to [use IV hydration].  If they're clinically stable, there is no need to do this; hemostatically stable, there is no need to do it").)  Plaintiff's expert clearly has a different opinion regarding the necessity of using IV hydration and medication to treat Plaintiff, but because Plaintiff points to no evidence suggesting Martin could not make an informed decision on the issue, or that Martin's decision was not based on sound medical judgment, the Court will not second-guess that judgment.  See Inmates of Allegheny, 612 F.2d at 762.  Other than the general conclusion offered by Turner that oral hydration and medication is ineffective for someone in Plaintiff's position, Plaintiff fails to adduce evidence suggesting Martin knew that his decision to administer fluids and medication orally was ineffective or entailed a substantial risk of harm.  See White, 897 F.2d 109.

It is undisputed that Martin, and several other SWSP medical personnel, examined Plaintiff multiple times between July 17, 2008, and August 1, 2008, the date of Plaintiff's second discharge from the Infirmary to general population, and noted his various symptoms, including

weight, heart rate, stool frequency and consistency, and other subjective complaints.  Each time

Plaintiff was transferred back to general population, Martin examined Plaintiff, noted that his

vital signs were "good" and "stable," and determined that because he did not find "anything

acute going on that warranted [Plaintiff] to be in [the Infirmary]," Plaintiff should be discharged.

(See Martin Dep. at 196-97, 240, 247.)  When he was discharged on July 21, 2008, Plaintiff

reported that his number of stools had decreased, that he was feeling better, and that he was not

vomiting, and he communicated that he understood the need to take his medication and continue

drinking water and nutritional supplements as much as possible.  (See Defs.' SMF ¶¶ 42-45.)

Plaintiff's weight was also at 139 pounds, (id. ¶ 43), the same weight he was at when he was

transferred to SWSP.  (See id. ¶ 32.)  On August 1, 2008, Martin found that Plaintiff's vital signs

were good, SWSP personnel had not witnessed any bleeding, and Plaintiff was eating and

drinking.  (Martin Dep. at 240:5-19; 247:6-11.)  Though Plaintiff's weight was at 133 pounds,

(Defs.' SMF ¶ 51), Martin believed it was "stable," and because he could not find anything

"acute going on," Plaintiff was discharged to general population.  (Martin Dep. at 240:5-19;

247:6-11.)  Whether or not Martin's decision was ultimately incorrect, or even negligent,

Plaintiff does not dispute that Martin was qualified to make such a judgment concerning

Plaintiff's treatment plan, or that Martin did in fact exercise his "professional judgment."  See

Inmates of Allegheny, 612 F.2d at 762.

        As far as the need for a GI consult, both parties acknowledge that a consultation was

requested and approved, and Martin's own comments on the GI consult referral form indicate

that he believed Plaintiff needed a GI consult.  (See Defs.' SMF ¶ 46; Ex. Q-1 to Robins Decl.,

July 21, 2008, GI Consult Referral Form.)  The record indicates that once Martin requested a

consult, it was up to other administrative officials to approve and schedule the necessary consult.

(See Defs.' SMF ¶ 46.)  In other words, not only was Martin's decision to request a GI consult the sort of decision the Court generally will not review in the context of an Eight Amendment claim, see Estelle, 429 U.S. at 107, a consult was in fact requested by Martin shortly after Plaintiff's arrival at SWSP, and the determination to approve and schedule the consult was made by other individuals.  The record simply does not reflect a denial of a reasonable request for medical treatment, an intentional refusal to provide care, or an act by Martin, or any other SWSP personnel, which prevented Plaintiff from obtaining the care they knew he reasonably needed.  See Lanzaro, 834 F.2d at 346; Inmates of Allegheny, 612 F.2d at 762.

What the Court is left with is a genuine dispute over the adequacy of Plaintiff's treatment, but not a dispute over whether Plaintiff was in fact treated by Martin, or whether Martin exercised his informed, professional judgment in making treatment decisions for Plaintiff.  This is insufficient to sustain Plaintiff's claim.  See Fantone 528 Fed. App'x at 125.  Eighth Amendment liability under § 1983 requires "more than ordinary lack of due care for the prisoner's interests or safety."  Whitley v. Albers, 475 U.S. 312, 319 (1986).  Here, the record does not indicate that Martin showed "deliberate indifference to [Plaintiff's] serious medical needs."  White, 897 F.2d at 109.

Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Count I against Martin.

### B.      Custom or Policy of Deliberate Indifference (Counts I and III)

Plaintiff apparently claims in his Amended Complaint that CMS, Meeker, Anicette, and Soliman had in place a policy or custom that violated his constitutional rights under the Eight Amendment, or were policymakers indifferent to Plaintiff's medical needs.

To sustain a § 1983 claim, Plaintiff "must provide evidence that there was a relevant … policy or custom, and that the policy caused the constitutional violation [he] allege[s]." <u>Natale</u>, 318 F.3d at 584.  Defendants argue that Plaintiff has failed to produce any such evidence, and the record does not reflect any evidence of the creation or implementation of a custom or policy which has been shown to have resulted in Plaintiff's alleged constitutional violation.  Therefore, the Court will grant Defendants' Motion for Summary Judgment as to Counts I and III against CMS, Meeker, Anicette, and Soliman.

**V.      CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment will be **GRANTED**.  An appropriate order shall issue today.

Dated:    3/10/2015                                           s/ Robert B. Kugler
                                                                     ROBERT B. KUGLER
                                                                     United States District Judge

26